**In the Matter of MAHURKAR DOUBLE LUMEN HEMODIALYSIS CATHETER PATENT LITIGATION.**

**No. MDL 853.**

United States District Court, N.D. Illinois, E.D.

Dec. 5, 1991.

Roy H. Wepner, Joseph S. Littenberg, John R. Nelson, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, N.J., for Vas–Cath, Inc., Gambro, Inc., Omni Medical Products, Inc.

Daniel W. Vittum, Jr., Russell E. Levine, Kirkland & Ellis, Chicago, Ill., for Vas–Cath, Inc., Omni Medical Products, Inc.

Arthur B. Sternberg, Pedersen & Houpt P.C., Chicago, Ill., for Gambro, Inc.

Michael W. Coffield, Michael J. Philippi, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for Geoffrey Martin, M. Jane Martin.

Joseph N. Hosteny, Raymond P. Niro, John C. Janka, Michael P. Mazza, Niro, Scavone, Haller & Niro, Chicago, Ill., for Sakharam D. Mahurkar.

Marvin A. Glazer, Cahill, Sutton & Thomas, Phoenix, Ariz., Granger Cook, Jr., Mark J. Murphy, Cook, Egan, McFarron & Manzo, Ltd., Chicago, Ill., for IMPRA, Inc.

Steven J. Baron, American Home Products Co., Michael J. Sweedler, Anthony C. Coles, Darby & Darby, P.C., New York City, Samuel Fifer, Sonnenschein Nath &

Rosenthal, Chicago, Ill., for Quinton Instruments Co.

H. Ross Workman, Brent P. Lorimer, Workman, Nydegger & Jensen, Salt Lake City, Utah, for Kendall Med–West.

Alan L. Unikel, Maureen Gorman, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for Michael Reese Hosp., University of Chicago Hospitals, Chicago Osteopathic Hosp., Jackson Park Hosp.

## OPINION

EASTERBROOK, Circuit Judge.*

All defendants have moved for summary judgment, maintaining that the hemodialysis catheters they make or used to make do not infringe Dr. Mahurkar's patent No. 4,134,402 (the '402 patent). This, the oldest of the Mahurkar patents in issue (five other U.S. utility patents, one U.S. design patent, and one Canadian design patent play large roles), is the basis of infringement claims against all of the remaining defendants' products.

Mahurkar replied to the motions with an affidavit under Fed.R.Civ.P. 56(f) and a motion to compel additional discovery. His adversaries lodged motions for protective orders. All parties have filed voluminous documents in support of their positions. It is all but impossible to decide the motions to compel (and for protective orders) without deciding the motions for summary judgment. I therefore describe the grounds of the motions and of Mahurkar's opposition, which appears not only in his motion to compel but also in his statement of the respects in which he believes the accused devices infringe the '402 patent.

I limit discussion to Vas–Cath's products, as Mahurkar concedes that the "Kendall and IMPRA catheters are substantially identical to [Vas–Cath's] VACCESS catheter" for purposes of this motion. This similarity is the basis of Mahurkar's motion to compel common treatment of the '402 infringement issues. If the VACCESS catheter does not infringe Mahurkar's '402 patent, neither do Kendall's or IMPRA's catheters.

Claim 1 of the '402 patent is the only independent claim asserted against these defendants' catheters. Claim 1 reads:

A double lumen hemodialysis catheter, comprising a unitary straight tube the periphery of which in transverse cross section defines a single closed plane curve at any point along the entire straight tube, an internal divider extending along a longitudinal portion of said tube and forming said tube into a blood intake lumen and a blood return lumen, one end of said blood return lumen extending beyond the associated end of said blood inlet lumen a distance sufficient to prevent mixing of the returned blood with the blood taken in, the one end of said blood return lumen being beveled with the extending [sic] from the lumen periphery opposite said divider and rearward of the distal end toward the distal end and said divider, the associated end of said blood inlet lumen being beveled with the bevel extending from the lumen periphery opposite said divider and rearward of the associated distal end toward the associated distal end and said divider, the distal end of said blood inlet lumen terminating rearward of the juncture of the blood return lumen bevel and the associated lumen periphery each of said lumens defining blood flow paths parallel one to the other along the entire length thereof and at the ends thereof such that blood entering said intake lumen and blood leaving said return lumen enter and exit the associated blood vessel in a direction substantially parallel to the vessel wall.

Figure 1 from the patent shows a side view of the catheter, and figure 2 shows the catheter inserted in a blood vessel.

---

* Of the Seventh Circuit, sitting by designation.

Figure 1

Figure 2

Blood enters the catheter upstream (at 4 in figure 1) and exits downstream (at 5). The tip is beveled. As the tube is circular at the tip, the bevel produces a point. A catheter with a rigid point may be inserted percutaneously (that is, the same way a needle is inserted, without the need for additional apparatus). The parallel flow of blood throughout the catheter reduces sudden changes in direction of the blood that cause turbulence and in turn may rupture the cells or diminish the rate of flow.

Vas–Cath contends that its catheters do not infringe Claim 1 for three reasons: (i) they have perpendicular rather than paral-

lel blood flow at the intake; (ii) they have a tapered nozzle at the return end rather than a beveled tip; and (iii) they lack a bevel at the inlet. Figure 3 shows Vas–Cath's VACCESS catheter:

Figure 3

Blood enters the catheter at 54, a hole cut through the tubing. The intake lumen ends there; the shaded portion is solid. The return lumen ends in a tip cut perpendicular to the tapering tube, and the blood exits through 40. The FLEXXICON catheter, Vas–Cath's current product, terminates this way:

Figure 4

Again the blood enters through holes cut in the side of the shorter lumen and is returned downstream at a tapered tip cut perpendicular to the tube. The intakes in the FLEXXICON catheter are not so clearly flush with the surface of the tubing, however, and one of the two holes is cut in a portion of the tube that is itself angled with respect to the main body of the catheter.

These diagrams make it simple to see what Vas–Cath is driving at. The tip of the catheter described in Claim 1 of the '402 patent is cut at an angle to form a point; the tips of Vas–Cath's catheters are tapered to a point rather than being cut on a bevel. The intake of the catheter described in the '402 patent is formed by cutting away the end of the intake lumen, producing parallel blood flow throughout the length of the catheter; the intakes of Vas–Cath's are holes in the side wall.

Mahurkar has two answers, one linguistic and one functional. The linguistic answer is that a bevel includes any angle one surface makes with another, except a right angle, see *Webster's Ninth New Collegiate Dictionary* (1985) (definition 2.a), making any tapered tip "beveled." So, too, Mahurkar asserts that the parallel flow language refers only to the flow inside the tubes, making the blood's sharp turn on intake in

a Vas–Cath catheter irrelevant: "Since the lumens themselves define the blood flow paths that Claim 1 requires, it is only inside the lumens and at their entrances (that is, inside the bores of the intake and return lumens, and at the entrance to those bores) that the direction of the blood flow path matters." Thus Mahurkar submits that both Vas–Cath catheters literally infringe Claim 1 of the '402 patent. If they do not, he submits, still they infringe by the doctrine of equivalents. See *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607 (1950). The tapered tip of the VACCESS and FLEXXICON catheters serves the same function as the angled tip of the '402 catheter—facilitating percutaneous insertion. The particular shapes and placement of the inlet holes (one for the VACCESS catheter, two for the FLEXXICON, and three for the Kendall and IMPRA products) actually lead to "substantially" parallel fluid flow, even if it looks to a novice (and any judge is a novice) like the entry would occur at a sharp angle. It is here that Mahurkar presses his demand for discovery to learn the results of tests the defendants have conducted, to obtain more samples and manufacturing details for analysis, to ask the designers of the accused catheters whether the products are indeed equivalent in function, and so on.

Vas–Cath, Kendall, and IMPRA reply to this by pointing to the prosecution history of the '402 patent. See *Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966). They believe that Mahurkar originally sought a patent that would cover products similar to theirs, was turned down by the Patent Office repeatedly, and eventually acquiesced in restrictive language to distinguish his invention from prior art. The verbiage in Claim 1 is not a fault of the scrivener so much as it is an accretion of layers of language designed to cut down the scope of the patent. The features that Vas–Cath and other manufacturers say distinguish their products from Claim 1 of the '402 patent are exactly the features Mahurkar had to disclaim in order to obtain the '402 patent.

Meaning of a patent is a question of law. E.g., *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir.1985); *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed.Cir.1991). Prosecution history offers insight into the meaning of the claims, just as knowing the sequence of amendments to a bill offers insight into the meaning of the enacted law. Consequently the effect of prosecution history on meaning is itself a question of law. The same doctrine, sometimes known as "file wrapper estoppel," serves the additional function of limiting the doctrine of equivalents. If the applicant for a patent amends his claims in order to avoid overlap with prior art, he cannot invoke the doctrine of equivalents to forbid a rival from using that feature, even if it serves to achieve the same objective as the patented feature. E.g., *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1579 (Fed.Cir. 1983).

The battle among the parties—the motions for summary judgment, the motions to compel and for protective orders—collapses to a debate about the implications of the prosecution history. If that history is uninformative and Claim 1 stands alone, then more discovery is essential. Mahurkar is right to say that the record is not sufficiently developed to allow decision on the question whether the accused catheters infringe by the doctrine of equivalents. If the prosecution history has the significance Mahurkar's rivals see in it, however, then no additional discovery need precede decision on the '402 patent.

Oddly, although the parties have debated with great vigor the motion to compel (and the mirror image motions for protective orders), Mahurkar's papers scarcely mention the prosecution history of the '402 patent. Perhaps he is reserving his fire for his opposition to the motions for summary judgment—an opposition he has yet to file, standing instead on his Rule 56(f) affidavit and motion to compel. But I cannot decide whether to grant the motion to compel without deciding the effect of the prosecution history, and if I deny the motion to compel (and grant the corresponding mo-

tions for protective orders), there is not much left to Mahurkar's claims under the '402 patent. The discovery debate and the appropriateness of summary judgment converge, and Mahurkar has been effectively silent on the nub of his rivals' contentions. It is tempting to say that he has waived any objection to his rivals' version of the prosecution history, yet I am reluctant to invoke waiver. Torrential flows of documents have inundated my chambers, and I tremble at what lies in store if I so much as hint that the parties have not been filing *enough* paper! Far better, then, to address the question substantively.

██ The original version of Claim 1, in Serial No. 657,282, reads:

A double lumen hemodialysis catheter comprising: a blood intake lumen, a blood return lumen contiguous with said intake lumen, the end of the return lumen extending beyond the end of the intake lumen a sufficient distance to prevent returning blood from re-entering said intake lumen.

Easy to understand, but too broad. It effectively claims all dual-lumen hemodialysis catheters. The examiner found many examples of dual-lumen catheters, causing Mahurkar to amend the claim to distinguish his invention from others. I bypass most of the history to concentrate on two citations that are especially illuminating.

One patent the examiner found is No. 2,474,665, issued to J.R. Guarino in 1949. The Guarino patent covered a dual-lumen catheter with parallel flow everywhere except at the intake. Figure 5 depicts the Guarino catheter.

**Figure 5**

Mahurkar's emphasis on the double-D (semicircular) tubing of his catheter was not enough for the examiner. Efforts to overcome the examiner's opposition led eventually to the "parallel" limitations in Claim 1. Mahurkar distinguished the Guarino device as one in which the intake lumen terminates with a flow normal (perpendicular) to the wall of the blood vessel. His own device, Mahurkar observed, produced a flow parallel to the walls of the vessel and thereby reduced both the chance that pressure would injure the vessel wall and the risk that a reduction in pressure would suck the wall toward the opening and obstruct the flow of blood. After two rounds of amendment the claim was limited to devices with flow parallel along the entire length of the catheter *and* "substantially parallel to the vessel wall." You have only to consult Figure 2 above to see how both aspects of parallel flow can be achieved.

Another of the examiner's concerns was patent No. 2,625,932, issued in 1953 to P.F. Salisbury. Figure 6 shows the Salisbury apparatus.

**Figure 6**

Here we find a dual-lumen catheter with parallel flow all along the length and at the ends, where the flow is parallel to the vessel walls. Once again Mahurkar's emphasis on his double-D tubing (Salisbury's tubes were circular) did not persuade the examiner that the prior art could be distinguished. Mahurkar then observed that the Salisbury catheter has "two separate tubes, one having a nozzle at one end thereof and the other having a bevel". Amendments to Claim 1 describing the bevel on both of Mahurkar's openings avoided the Salisbury reference. Mahurkar depicted the bevel on the downstream end of his catheter as one that produces a point to facilitate insertion.

The '402 patent then issued. It has survived reexamination, a process that Vas–Cath and its fellow accused infringers say

further restricted the scope of Claim 1 but that I need not pursue here. (The patent was unchanged after the reexamination.)

One point in Mahurkar's favor is that the right panel of Figure 6 does not show a tapered opening of the sort present in the Vas–Cath, Kendall, and IMPRA catheters. Mahurkar contends that a taper, indeed any angle, is a "bevel" for purposes of the '402 patent. The left panel of Figure 6 shows such a taper; perhaps that is enough. Although you can tease an equivalence between tapers and bevels out of a dictionary, it is harder to get it out of patent files. In 1983 Mahurkar filed an application (serial No. 538,671, eventually producing patent No. 4,583,968) for a "smooth bore double lumen catheter". Figure 7 shows the tip of this new design:

**Figure 7**

Mahurkar contended (successfully, as things turned out) that this tapered design is patentable over his own '402 patent and his design patent No. 272,651 because it *does not have a bevel* on the intake lumen. (The catheter covered by the '651 patent is depicted in Figure 3 of *Vas–Cath Inc. v. Mahurkar*, 745 F.Supp. 517, 519 (N.D.Ill. 1990).)

The upshot of this history is that the Vas–Cath, Kendall, and IMPRA catheters do not infringe the '402 patent and cannot be made to do so by the doctrine of equivalents. As I have said, the meaning of the '402 patent is a question of law; so is the effect of its prosecution history. Although infringement is a question of fact, when there are no disputed *material* issues, summary judgment is appropriate.

Claim 1 of the '402 patent requires parallel blood flow not only within the tubing but also at the points the blood enters and leaves the catheter, where the flow must be parallel to the vessel walls. The Vas–Cath, Kendall, and IMPRA catheters, like the Guarino catheter, draw in blood through apertures that open at right angles to the path within the tube and to the flow of blood within the vessel. Perhaps the openings serve equivalent functions, but the prosecution history bars Mahurkar from making this demonstration. So, too, the accused catheters' blood intakes are un-beveled, for the reasons Mahurkar described serial '671 as un-beveled.

■ And the tapered tips of the accused catheters are not cut obliquely to produce a point. While it is linguistically possible to use the word "bevel" to refer to a taper by emphasizing the *angle* aspect of the definition, I am convinced by reading the documents that Mahurkar used "bevel" to refer to an angled *cut* through the tubing. The Oxford English Dictionary includes many senses of "bevel"; what unites them is the element of cutting at an angle. Tapered tips are not formed by cutting at an angle. So the tips of the accused catheters do not literally infringe the '402 patent and cannot be brought back within it by the doctrine of equivalents. There is accordingly no reason to allow further discovery into the issues raised by the doctrine of equivalents.

One is inclined to ask what this fuss is about. What Vas–Cath, Kendall, and IMPRA have done to establish non-infringement of the '402 patent strengthens Mahurkar's case that their catheters *do* infringe his '968 and '651 patents, perhaps more besides. Underneath this strategy must be a belief that the '968 and '651 patents are more vulnerable on other grounds. A motion for summary judgment on the '651 patent remains pending, and two of the other patents (the '141 and '329 patents) face a contest at trial concerning the adequacy of the written description in the earliest filings from which they take their priority dates. At all events, although removing the claims based on the '402 patent

will not shorten the case or avoid a trial, it will simplify that trial—and simplification of trials is much to be desired, for a reduction in the number of issues increases the chance that the jury will be able to resolve the remainder accurately.

I deny Mahurkar's motion to compel and grant the motions for protective orders. Formally, I am not granting the motions for summary judgment. Now that Mahurkar knows that no additional discovery will be taken on this question, he has one last opportunity to persuade me that his rivals have depicted the prosecution history incorrectly. I give Mahurkar 14 days to file a brief in opposition to the pending motions for summary judgment. No reply briefs will be accepted without order of court, and unless Mahurkar's brief casts the subject in a new light I will grant the motions for summary judgment by return mail without further explanation.

**Other pending business.** Mahurkar's "Motion to Strike Pursuant to Fed.R.Civ.P. 12(f) and for Other Relief Pursuant to Court's Inherent Authority" is denied. The motion—a litany of complaints about Vas–Cath's rhetoric—must have been filed for effect rather than with any prospect of action. I cannot strike language out of briefs filed in the Federal Circuit and am not inclined to take a red pencil to the briefs filed in this court. This is hard-fought litigation, and if Vas–Cath has overstepped the bounds of propriety it will have to work to overcome the skepticism that greets future presentations. Neither side is free from sin in this case.

Mahurkar's "Request for Decision Pursuant to Local Rule 12(r)" is denied; the case is slowly wending its way to final decision. The conference scheduled for December 19 will include discussion of discovery and oral arguments on Vas–Cath's third motion for partial summary judgment (concerning the '651 patent). I am particularly interested in the parties' views about (a) whether it is possible or desirable to conduct the discovery in a particular sequence; (b) the cutoff date for discovery; and (c) the date for trial. Vas–Cath should be aware that I will not entertain any fur-

ther motion for summary judgment concerning the adequacy of the written description underlying the '141 and '329 patents. *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed.Cir.1991), may not absolutely forbid further inquiry on this subject, but it means that efforts in that direction are not worth the candle. Once discovery closes, we will move promptly to trial.