In re MAHURKAR DOUBLE LUMEN
HEMODIALYSIS CATHETER
PATENT LITIGATION.

Sakharam MAHURKAR,
Plaintiff–Appellee,

Quinton Instruments Company,
Plaintiff–Appellee,

v.

IMPRA, INC., Defendant–Appellant.

No. 94–1242.

United States Court of Appeals,
Federal Circuit.

Dec. 12, 1995.

Raymond Niro, Niro, Scavone, Haller &
Niro, Chicago, Illinois, argued for plaintiff-
appellee, Sakharam Mahurkar. With him on
the brief were Joseph N. Hosteny, John C.
Janka and Michael P. Mazza.

Michael J. Sweedler and Steven J. Baron,
Darby & Darby, New York City, represented

plaintiff-appellee, Quinton Instruments Company.

James F. Polese, Polese, Hiner & Nolan, P.C., Phoenix, Arizona, argued for defendant-appellant, Impra, Inc. With him on the brief were Dale M. Heist, Woodcock, Washburn, Kurtz, Mackiewicz & Norris, Philadelphia, Pennsylvania, and Victoria Gruver, Guttilla & Murphy, P.C., Phoenix, Arizona. Of counsel was Dennis L. Hall.

Before RICH, MICHEL, and PLAGER, Circuit Judges.

PLAGER, Circuit Judge.

Impra, Inc. appeals from the January 25, 1994 revised judgment of the United States District Court for the Northern District of Illinois, Easterbrook, J., sitting by designation, holding Impra liable for infringement of U.S. Patent No. 4,583,968 (the '968 patent) and awarding lost profit damages of $4,589,-472. The district court held, *inter alia*, that Impra literally infringed claims 1–3, 6–8, 11 and 20–23 of the '968 patent, and failed to prove that these claims were invalid under 35 U.S.C. § 102(b) (1988).[1] In its decision, reported at 831 F.Supp. 1354, 28 USPQ2d 1801 (N.D.Ill.1993), the court concluded that the '968 patent was entitled under 35 U.S.C. § 120 to an effective filing date of Sakharam Mahurkar's (Mahurkar) earlier-filed design patent application, Serial No. 538,671, which included the same drawings as those found in the utility application. The court also held that under the circumstances of this case, an exclusive licensee's bona-fide Uniform Commercial Code sale for nonexperimental purposes of a prototype embodying the claimed invention did not place the invention "on sale" for purposes of section 102(b). The district court also concluded that Mahurkar and Quinton Instruments Company (Quinton) were entitled to lost profit damages, based on lost sales and price suppression.[2] We affirm.

## BACKGROUND

Mahurkar is the owner of the '968 patent, entitled "Smooth Bore Double Lumen Catheter," which issued on April 22, 1986. A double lumen catheter consists of a pair of hollow tubes (lumens), one removing blood from a blood vessel for processing in a dialysis machine and the other returning the processed blood to the vessel near the point of removal. The '968 patent is directed to an improved double lumen catheter made of two semi-circular (double–D) lumens that end in a conically tapered tip. Unlike the prior art catheters which have two coaxial circular-shaped lumens, Mahurkar's construction allows for both efficient blood flow and minimal insertion trauma to the patient.

In 1980, Mahurkar conceived the idea that eventually gave rise to the patented invention. On February 1, 1982, prior to filing any applications for the patents at issue in this appeal, Mahurkar granted an exclusive license to Quinton to make, use, and sell these double lumen catheters. Paragraph 2.8 of the License Agreement conditioned Quinton's exclusive status on it marketing Mahurkar's catheters by September 30, 1982.

As of August 1982, Quinton had not yet made any sales of the double lumen catheters, purportedly due to its inability to make the catheters in accordance with Mahurkar's specifications. In an effort to maintain its status as an exclusive licensee, Wayne Quinton, the chief executive officer of Quinton, contacted Christopher Blagg, a longstanding acquaintance and the executive director of Northwest Kidney Center (Northwest), and asked Blagg to buy 20 of these catheters from Quinton as a personal favor. Despite the fact that Northwest did not use this type of catheter, as it sent its patients to hospitals for catheter insertion, Blagg authorized the purchase. Northwest subsequently received a bill for the purchase of 20 catheters at $20 each. Northwest never paid this bill, but the record shows that Northwest received and paid for two prototype catheters on August 31, 1982 (Northwest transaction).

---

1. Unless specified otherwise, all cites to the United States Code are to the 1988 edition.

2. The damages portion of the opinion was subsequently amended by orders dated December 20, 1993 and January 24, 1994.

Upon receipt, Dr. Tom Sawyer, chief staff physician at Northwest, stored the catheters in a cabinet where they remained, unused, as of the commencement of this litigation. The catheters had a number of serious defects, which would have increased the risk of injury to patients using the catheters for dialysis. The instructions accompanying both of the catheters directed the user to sterilize them in an autoclave at 250 degrees for 30 minutes before insertion in a patient. The district court found that treating the catheters according to these instructions would have melted the catheters, or at least deformed them, rendering them unusable.

Mahurkar protested to Quinton that the Northwest transaction was a sham, and that he was therefore entitled per paragraph 2.8 of the License Agreement to terminate Quinton's status as an exclusive licensee. The parties ultimately settled their dispute, and throughout all relevant times Quinton has continued to retain exclusive rights under the License Agreement. Quinton eventually introduced Mahurkar's catheters into the market for widespread commercialization in April 1983.

On October 3, 1983, more than one year after the Northwest transaction but less than one year from the time Mahurkar's catheters were first commercially marketed, Mahurkar filed a design patent application, Serial No. 538,671 (the '671 application), claiming the ornamental design for the smooth bore double lumen catheter described above. The application included seven drawings showing different views of the claimed design. The '671 application was abandoned in July 1985.

On August 15, 1984, Mahurkar filed a utility application. This application, which contained the same seven drawings included in the '671 design application, was labeled a "continuing" application of the '671 application. The '968 patent eventually issued on

April 22, 1986 on this application, which claimed the benefit of the '671 design application's filing date, October 3, 1983.

Mahurkar and Quinton filed suit against Impra on July 12, 1990 in the United States District Court for the Northern District of Illinois for infringement of the '968 patent.[3] Impra answered Mahurkar and Quinton's complaint by alleging noninfringement and asserting, *inter alia,* that the claims at issue were invalid under section 102(b) as anticipated. Impra's anticipation theory was twofold. First, Impra argued that the '968 patent was not entitled pursuant to 35 U.S.C. § 120 to the '671 design application's filing date because the drawings in the '671 design application did not adequately describe the '968 patented invention as required by 35 U.S.C. § 112. Consequently, Impra argued, the admitted commercialization of the patented invention in April 1983 predated the filing date (August 15, 1984) of the '968 patent application by more than one year. Second, Impra argued that even if the '968 patent were entitled to the '671 design application's filing date of October 3, 1983, the Northwest transaction, which occurred more than one year prior to the design application's filing date, placed the patented invention "on sale."

At the conclusion of a bench trial the district court rendered its judgment, finding claims 1–3, 6–8, 11 and 20–23 of the '968 patent valid (i.e., not proved invalid) and literally infringed, and awarding lost profit damages. The court found that the drawings accompanying the '671 design application described the invention claimed in the '968 patent as required by section 112, and that therefore pursuant to section 120 the effective filing date of the '968 patent was October 3, 1983, the filing date of the '671 design application. 831 F.Supp. at 1365, 28 USPQ2d at 1809.

Regarding the Northwest transaction, the court found that the two prototype catheters

---

**3.** Mahurkar initially filed suit against Impra and four hospitals for infringement of U.S. Patent No. 4,692,141, U.S. Patent No. 4,134,402 and U.S. Patent No. 4,583,968. The four hospitals having settled, this appeal only addresses issues relating to Mahurkar's suit against Impra for infringement of the '968 patent. Prior to trial the district court granted summary judgment of nonin-

fringement of the '402 patent. *Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.,* 781 F.Supp. 1295, 22 USPQ2d 1218 (N.D.Ill.1991). Likewise, the '141 patent is not at issue as the district court, finding it unnecessary in view of its decision regarding the '968 patent, did not resolve any issues relating to the '141 patent.

sold to Northwest, though crudely designed, constituted a reduction to practice of the '968 patented invention. 831 F.Supp. at 1367–68, 28 USPQ2d at 1810–11. The court found that this transaction was a sale under contract law (the Uniform Commercial Code) for nonexperimental purposes. 831 F.Supp. at 1367–68, 28 USPQ2d at 1811. The court, however, rejected any mechanical rule for determining whether an invention is "on sale," and instead considered the totality of the circumstances in view of the underlying purposes of section 102(b). The court concluded that the Northwest transaction did not place Mahurkar's device "on sale" within the meaning of section 102(b). Finally, the court determined that Mahurkar and Quinton were entitled to lost profit damages for lost sales and price suppression, and directed each party to submit calculations based on the methodology set forth in its opinion.

On October 22, 1993, the court, after receiving each party's submissions, issued its damages opinion, awarding $5,328,557.17 in damages. Judgment was entered accordingly. This amount was subsequently amended by orders dated December 20, 1993 and January 24, 1994. On January 25, 1994, the district court amended its earlier judgment and issued a revised judgment awarding lost profits of $4,589,472. This appeal followed.

Impra raises several arguments on appeal. First, Impra argues that the court erred in concluding that the '968 patent was entitled to the '671 design application's filing date. Second, Impra appeals the district court's conclusion that the Northwest transaction did not place the '968 patented device "on sale." Third, Impra appeals the district court's award of damages, arguing that the court erred in awarding lost profits, as opposed to a reasonable royalty, and in the methodology it used to calculate lost profit damages.

We have considered Impra's first and third arguments, and, having accorded the district court the appropriate degree of deference, find them unpersuasive. As to the first argument, the district court heard testimony from three experts who testified that each claim element was shown in the design application drawings. The court noted that the

examiner came to the same conclusion as he allowed the utility application as a continuation of the design application. As to the third argument, the district court did not abuse its discretion in awarding damages for lost profits, based on lost sales and price erosion, or in its calculation of damages. The award of damages was consistent with our precedent, *see, e.g., Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1578–81, 24 USPQ2d 1401, 1417–19 (Fed.Cir.1992); *Bio–Rad Lab., Inc. v. Nicolet Instrument Corp.,* 739 F.2d 604, 615–17, 222 USPQ 654, 663–64 (Fed.Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984), and the record fully supports the judgment. We therefore affirm these aspects of the district court's decision. Accordingly, we turn to the principal issue on appeal, whether the Northwest transaction placed the patented invention "on sale." Because this transaction occurred more than one year prior to '968 patent's effective filing date, the claims of the '968 patent are invalid under section 102(b) if we agree with Impra.

## DISCUSSION

An inventor loses the right to a patent if he placed the claimed invention "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Whether an invention is on sale is a question of law. As one challenging the validity of a presumptively valid patent, *see* 35 U.S.C. § 282, the accused infringer must prove by clear and convincing evidence that "there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention." *UMC Elecs. Co. v. United States,* 816 F.2d 647, 656, 2 USPQ2d 1465, 1472 (Fed.Cir.1987).

Impra's argument on appeal is that the Northwest transaction invalidates the patent under section 102, as it involved a sale under contract law of the claimed invention, for nonexperimental purposes, after the invention had been reduced to practice. According to Impra, the district court improperly considered the circumstances surrounding

the Northwest transaction, particularly Mahurkar's contention that the sale was a "sham" transaction. We disagree.

■ As we have repeatedly said, whether a device has been placed on sale is not subject to a mechanical rule. *Ferag AG v. Quipp Inc.,* 45 F.3d 1562, 1565, 33 USPQ2d 1512, 1515 (Fed.Cir.1995); *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 621, 225 USPQ 634, 639 (Fed.Cir. 1985); *UMC Elecs. Co.,* 816 F.2d at 656, 2 USPQ2d at 1471–72. On the contrary, the on-sale determination depends on the totality of the circumstances, considered in view of the policies underlying section 102(b). *Ferag AG,* 45 F.3d at 1565, 33 USPQ2d at 1515; *UMC Elecs.,* 816 F.2d at 656, 2 USPQ2d at 1471–72. These policies include: (1) discouraging removal of inventions from the public domain that the public reasonably has come to believe are freely available; (2) encouraging the prompt and widespread disclosure of inventions; (3) allowing an inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and (4) prohibiting an inventor from commercially exploiting his invention beyond the statutorily prescribed time. *Envirotech Corp. v. Westech Eng'g Inc.,* 904 F.2d 1571, 1574, 15 USPQ2d 1230, 1232 (Fed. Cir.1990).

■ Our court has stressed that commercialization is the central focus for determining whether the patented invention has been placed on sale. *Ferag AG,* 45 F.3d at 1565, 33 USPQ2d at 1515 ("Foremost [ ] is the policy of preventing inventors from exploiting the commercial value of their inventions while deferring the beginning of the statutory term."). Consequently, "the inventor is strictly held to the requirement that he file his patent application within one year of any attempt to *commercialize* the invention." *Id.* (emphasis added). Because we conclude that Quinton's sale to Northwest was a sham that did not result in "commercialization" of the invention or place it in the public domain, no § 102(b) sale occurred even though the prototype was a reduction to practice of the invention. *Cf. Timely Prods. Corp. v. Arron,* 523 F.2d 288, 187 USPQ 257 (2d Cir.1975), *cited with approval in Barmag Barmer Mas-* *chinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 221 USPQ 561 (Fed.Cir.1984).

We believe that the relevant facts indicate that no commercialization took place here. Quinton did not advertise the catheters, nor offer them to anyone but Blagg prior to the critical date. The Northwest transaction was a special deal made in an attempt to satisfy the requirements of a licensing agreement, not a sale made on ordinary commercial terms. Mahurkar did not believe that Quinton had a marketable product that could be offered to customers. Consequently, Mahurkar protested that the "sale" was a sham transaction that did not satisfy the requirements of the licensing agreement. Northwest bought the catheters outside of the usual channels, as a favor to Wayne Quinton rather than as an ordinary commercial purchase. Moreover, the catheters were unusable for their intended purpose by anyone who followed the instructions included with the catheters.

The other policies also suggest that the Northwest transaction was not a § 102(b) sale. The sale of two prototype catheters to Northwest did not place the invention in the public domain or lead the public to believe that the device was freely available. No members of the public outside of Northwest were likely aware of the transaction at all. If they had been aware, the circumstances of the transaction indicated that it was a sham transaction designed to satisfy a licensing agreement, rather than an ordinary commercial sale that would indicate that the invention was in the public domain.

That the Northwest transaction was not a § 102(b) sale is also consistent with encouraging the prompt and widespread disclosure of inventions and allowing an inventor a reasonable amount of time following sales activity to determine the potential value of a patent. The Northwest transaction was not "sales activity" that helped the inventor determine the value of a patent. Selling two unmarketable prototypes with instructions that made them unusable could not provide information as to the value of a patent. This suggests that the transaction did not impermissibly extend the one-year period allowed

for inventors to evaluate the value of a patent before filing an application.

## CONCLUSION

The judgment of the district court holding Impra liable for infringement and awarding lost profit damages is

**AFFIRMED.**