Aoki v. FMT Corp.                    CV-96-042-JD  03/23/98   P

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Aoki Technical Laboratory, Inc.

        v.                              Civil No. 96-042-JD

FMT Corporation


O R D E R


The plaintiff, Aoki Technical Laboratory, Inc. ("Aoki")
brought this action against the defendant, FMT Corporation, Inc.
("FMT"), seeking a declaratory judgment that certain patents held
by FMT are invalid, unenforceable, and are not infringed by Aoki.
Before the court are the parties' objections to the special
master's report and recommendation ("master's report") on FMT's
motion for a preliminary injunction (document no. 8).


Background[1]

The plaintiff, Aoki, is a Japanese corporation with its
principal place of business in Japan.  Aoki is in the business of

_____

   [1]The court recites only those facts relevant to the
resolution of the instant motion.  The court's order represents
its findings of fact and conclusions of law pursuant to its de
novo review of FMT's motion for a preliminary injunction, the
master's report, and the parties' objections to the master's
report.  As such, the court's findings of fact are preliminary
and without preclusive effect.  To the extent that the court's
findings of fact and conclusions of law differ from those of the
special master, the court declines to adopt the master's report.

manufacturing and selling injection stretch blow molding machines which are used to make plastic containers such as water bottles. Among its clients is the Twin Mountain Spring Water Co. ("Twin Mountain") of Nashua, New Hampshire, who has purchased at least two of Aoki's bottle manufacturing machines.

The defendant, FMT, is a New Hampshire corporation with its only place of business in Londonderry, New Hampshire. FMT manufactures and sells spare parts to manufacturing companies. FMT owns three U.S. patents issued to John A. Marcinek.[2] The patents (further discussed below) generally claim a mold and core rod combination for forming a plastic parison which is later either stretched or blown, or stretched and blown, into a final bottle shape.[3]

FMT has succeeded in two previous litigations against infringers of the Marcinek patents. In 1989, FMT became aware that Constar Plastics, Inc. ("Constar"), a major plastic bottle manufacturer, and Nissei ASB Company ("Nissei"), a machine

_____

[2]These patents, collectively identified as the "Marcinek patents," possess the following patent numbers: U.S. Pat. Nos. 4,432,530, 4,521,369, and 4,588,620. The court has reviewed and adopts by reference the special master's discussion of the prosecution history of claim 1 of the Marcinek patents.

[3]The term "parison" as used by the parties and the court refers to a preform. A preform is an intermediary plastic formation that precedes the final bottle form and is later stretched or blown to achieve the final shape.

2

manufacturer, were infringing its patents.  In April 1990, FMT filed suit against Nissei.  See FMT Corp. v. Nissei ASB Co., No. 1:90-CV-786-GET (N.D. Ga. filed Apr. 1990).  The court held in favor of FMT, finding the Marcinek patents both valid and infringed, and awarded FMT $3.5 million in damages and attorney fees.  The Court of Appeals for the Federal Circuit upheld the decision, and subsequently, Nissei settled the lawsuit by entering into a licensing agreement with FMT.

In December 1991, after prevailing on its claims against Nissei, FMT sued Constar.  See FMT Corp. v. Constar Plastics, Inc., No. 1:91-CV-3148-GET (N.D. Ga. filed Dec. 1991).  This case was assigned to a special master who again found the Marcinek patents valid and infringed.  The district court adopted the master's finding of validity and infringement and entered judgment in FMT's favor.  Thereafter, the parties settled the case with respect to damages and entered into a licensing agreement.

The present case started when FMT sued Twin Mountain for engaging in bottle manufacturing and having bottle manufacturing equipment that infringed the Marcinek patents.  See FMT Corp. v. Twin Mountain Spring Water Co., No. C-96-135-JD (D.N.H. filed Mar. 7, 1996).  Learning that the accused equipment was purchased from Aoki, Frederick J. Feddersen, president of FMT, had a

3

telephone conversation with Toshiyuki Murakami, vice president of Aoki, during which he advised Murakami of the aforementioned litigations[4] and offered a paid-up license for $5 million.  See FMT's Answer and Countercl. with Demand for Jury Trial, ¶ 8. Aoki responded by filing this declaratory judgment action against FMT.  FMT then moved for a preliminary injunction against both Twin Mountain and Aoki.  The court consolidated the cases for the purposes of discovery and preliminary injunction.  See Aoki Technical Lab. v. FMT Corp., No. C-96-42-JD (D.N.H. Order of June 20, 1996).  Thereafter, Twin Mountain entered into a licensing agreement with FMT and the court dismissed FMT's claims against it with prejudice.

The case was assigned to Magistrate Judge James Muirhead for the purpose of resolving the motion for preliminary injunction. During the hearing, the Magistrate Judge became aware of a conflict of interest and recused himself.  The court, with the parties' agreement, then appointed a special master, David G.

---

[4] The relationship between Aoki and Nissei is noteworthy. Until March 1976, Aoki was a division of Nissei Plastics, responsible for injection-stretch-blow research and development. See Aoki's Opp'n to FMT's Mot. for a Prelim. Inj., Decl. Of Takeuchi ("Decl. of Takeuchi"), ¶¶ 3, 4.  Even after the formation of Aoki, Nissei remained its sales agent.  See id., ¶ 2.  The product was even sold under Nissei's name, viz the Nissei ASB 400 ("ASB 400").  Aoki took over its own marketing in 1983.

4

Conlin, to resolve the motion for preliminary injunction and to preside over discovery disputes. Special Master Conlin (the "master") allowed the parties to file supplementary briefs and after a hearing issued the master's report, to which both parties filed objections. The master in his report has presented a very thorough, thoughtful, and detailed discussion of the issues raised by the pending motion.

The court undertakes a review of the master's report and recommendation de novo. See 28 U.S.C.A. § 636(b)(1)(C) (West 1997). The objections filed by the parties to the substance of the master's report will be discussed in the context of the court's de novo review of that report. In particular, the court will review: (1) FMT's contention that it was improperly denied an evidentiary hearing; (2) the elements necessary for granting a preliminary injunction in the context of the factual and legal issues presented in this case; and (3) the parties' remaining objections.

<u>Discussion</u>

I.   <u>FMT's Request for an Evidentiary Hearing</u>

FMT contends that it was entitled to an evidentiary hearing on the evidence pertinent to the motion, and by abridging that right the master did not receive all of FMT's evidence before

ruling.  <u>See</u> FMT's Obj. to Master's Report, at 4.

The record indicates that the parties were in the process of an evidentiary hearing before Magistrate Judge Muirhead when he learned of a conflict and recused himself.  After the master was appointed, he reviewed the parties' documents and determined that an evidentiary hearing was unnecessary.  In lieu of an evidentiary hearing, the master allowed the parties to present supplemental briefs to reflect and incorporate any additional evidence they wished to present.  The parties neither filed a request for an evidentiary hearing nor objected to the procedures established by the master.  <u>See</u> Master's Report, ¶ 6.

Because both parties submitted to the master's new briefing schedule (in effect, agreeing not to have live testimony in the hearing before the master) and neither raised an objection nor filed a motion requesting an evidentiary hearing, the court considers this objection waived.[5]

---

[5]This proceeding is preliminary in nature and not a complete disposition of the matter.  FMT has not been precluded from fully presenting its evidence at an appropriate time in the proceedings.  Even if either or both of the parties had requested an evidentiary hearing, the master was not required to hold one as long as the parties had a full opportunity, as they did here, to present their cases to the master both orally and in writing.

II.  Preliminary Injunction Requirements

Ordinarily, the grant of a preliminary injunction is not strictly a matter of right, but rather is within the court's discretion and will depend on the circumstances of each case. See 35 U.S.C.A. § 283 (West 1984); Rice & Adam Corp. v. Lathrop, 278 U.S. 509, 514 (1929).  In a motion for preliminary injunction, the patentee may adduce evidence of prior adjudication of the patent's validity against a different defendant to support its burden of proving likelihood of success on the merits.  See Hybritech v. Abbot Lab., 849 F.2d 1446, 1452 (Fed. Cir. 1988).  However, evidence of successful prior adjudications, in and of itself, does not bind the district court.  See, e.g., id.; Blonder-Tongue Lab., Inc. v. University of Ill. Found., 402 U.S. 313, 318 (1971).  Instead, the court may, in its discretion, give weight to such evidence when determining the likelihood of success on the merits.  See Hybritech, 849 F.2d at 1452.

In a patent case, as in other cases, the court considers four factors in determining whether or not a preliminary injunction should issue:  "(1) reasonable likelihood of success on the merits; (2) irreparable harm [to the movant]; (3) the balance of hardships tipping in [the movant's] favor; and (4) the impact of the injunction on the public interest."  Hybritech, 849

F.2d at 1451; see also Roper Corp. v. Litton Sys., 757 F.2d 1266, 1268 (Fed. Cir. 1985). To meet its burden of proving entitlement to a preliminary injunction, the movant is required to make a "clear showing" that it would succeed on the merits of its claim. See Atlas Powder Co. v. Ireco Chem., 773 F.2d 1230, 1233 (Fed. Cir. 1985).[6] However, "a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993).

A.  Likelihood of Success

In a patent case, to satisfy the first requirement the patent holder must establish by a "clear showing" that the patent is both valid and infringed. See Atlas Powder Co., 773 F.2d at 1233. "While it is not the patentee's burden to prove validity,[7]

_____

[6]The parties seem to confuse this requirement with the general standard for proving patent invalidity and/or infringement. While the standard for finding invalidity or infringement requires a showing of clear and convincing evidence, see Custom Accessories, Inc. v. Jeffrey-Allen Indus., Inc., 807 F.2d 955, 961 (Fed. Cir. 1986), for the purposes of a preliminary injunction the challenger need only make a showing of a "reasonable likelihood" that it would succeed in meeting this burden.

[7]"A patent shall be presumed valid. . . . The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C.A § 282 (West 1997).

[for the purpose of a preliminary injunction motion] the patentee must show that the alleged infringer's defense lacks substantial merit."  New Eng. Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 883 (Fed. Cir. 1992).

###### 1. Validity

The burden of proving invalidity rests with Aoki.  In this case Aoki claims that the patents are invalid pursuant to 35 U.S.C. § 102(b) for three reasons.  First, Aoki claims that its demonstration of the ASB 400 at the 1976 National Plastic Exposition ("NPE") trade show in Chicago prior to the critical date renders the Marcinek patents invalid.[8]  Second, Aoki contends that the claimed invention was anticipated in view of the existing prior art, and therefore invalid.  Third, Aoki alleges that the patents are unenforceable because of fraud committed upon the Patent and Trademark Office ("PTO") in procuring them.

FMT's reply to this three-fold objection is as follows:

---

[8]The term "critical date" as applied in the context of § 102(b) refers to the date which is one calendar year prior to the filing of the patent application with the patent office.  In this case, because the first patent application was filed on December 23, 1977, the critical date is December 23, 1976.

first, the Nissei ASB 400 did not contain each and every element of the Marcinek patents and therefore cannot satisfy the statutory bar requirements of § 102; second, the trade show exhibition of the ASB 400 did not constitute public use since the parisons were maintained confidentially and were not displayed publicly;[9] and third, FMT alleges that the declaration of Aoki's expert, Setsuyuki Takeuchi, is to be viewed with suspicion due to the high degree of his involvement in the case.[10]  FMT also

_____

[9] To this end, FMT presents the declaration of John Peacher, who states the following:  "Based on my recollection, I asked for a preform from the ASB 400 machine and was not able to obtain one."  FMT's Supplemental Brief in Supp. of FMT's Mot. for Prelim. Inj., Decl. of John Peacher, ¶ 24.

[10] The court notes that Takeuchi's testimony was excluded from evidence in the Constar litigation.  However, this suppression appears to be the result of an evidentiary ruling that the documents forming the basis of his testimony had not been properly authenticated rather than an indication that the witness lacked veracity.  See Tr. of Prelim. Inj. Hr'g before Magistrate Muirhead, at 44-46 (June 11, 1996).

Takeuchi testified that Nissei Plastic files which were not available in the Constar litigation were made available for this case.  See Decl. of Takeuchi at 4.  These documents include photographs and correspondence with clients of the 1976 NPE trade show.  Aoki's two step process was illustrated in a chart in the 1976 NPE trade show.  See id. at 6.  Takeuchi designed the ASB 150 and the ASB 400 and prepared them for NPE shows.  The purpose of demonstrating the machine at the show was "to interest customers in buying the ASB 400."  Id. at 23.  The print date of the brochure detailing the operation of the machine was  Oct. 26, 1976, and the brochures were handed out at the show to interested visitors.  See id., at Ex. 21.

10

argues that, because Aoki's activities at the NPE trade show did not promote the policies underlying § 102(b), the court should overlook the express statutory requirements of § 102(b) and rule in FMT's favor.[11]  Finally, FMT urges upon the court that its successful prior litigations, in combination with the fact that the Marcinek patents have successfully endured the Patent Office's examinations and a re-examination, are strong evidence of validity.[12]

### (a)   The § 102(b) Bars

The statute authorizing the issuance of patents provides:

---

[11]In advancing this public policy argument, FMT presents no statutory or common law precedent.  Therefore, in view of the clear statutory language and strong case law supporting the contrary position, the court finds FMT's conclusory argument to be without merit.

[12]  Evidence of successful prior adjudications upholding the patent's validity can be introduced by the patent holder to support and strengthen the claim of validity.  However, as the Federal Circuit has explained:

> This is not to say that the district court is bound, as a matter of law, by the prior adjudication of validity. Rather, the district court as an exercise of its discretion, may give considerable weight to a prior adjudication of validity in determining the likelihood of success on the merits on the issue of validity in the preliminary injunction proceedings before it.

Hybritech, 849 F.2d at 1452 (emphasis supplied).

11

"A person shall be entitled to a patent unless . . . [the invention was] in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ." 35 U.S.C. § 102(b) (emphasis supplied). The policies underlying this law are discussed in 2 Donald S. Chisum, Chisum on Patents § 6.02 (1997). The first policy is to avoid detrimental public reliance; that is, the public should not come to believe that the product is in the public domain, and then have it taken away. The second policy is to encourage prompt disclosure of new information. Finally, the third policy is to discourage inventors from extending the life of a patent by filing only when they are faced with competition. See id.; see also In re Mahurkar, 831 F. Supp. 1354, 1369 (N.D. Ill. 1993).

The statutory bars to patentability, found in § 102(b) can be triggered by any of the following occurances prior to the critical date: the issuance of a patent or printed publication, the public use of the invention, selling the invention, or the commercial exploitation of the invention through experimental use. See Chisum, supra, § 6.02[1]-[7]. The court will consider the "totality of the circumstances" when evaluating issues arising under the public use or the on-sale bar of § 102(b). See In re Brigance, 792 F.2d 1103, 1107 (Fed. Cir. 1986). In this

12

case, Aoki contends that the Marcinek patents are invalid pursuant to both the on-sale bar and the public use doctrines of § 102(b).

### (i) On-Sale Bar

"The issue of whether an invention is on sale is a question of law." UMC Elecs. Co. v. United States, 816 F.2d 647, 657 (Fed. Cir. 1987) (quoting Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984)). The on-sale bar determination requires that the claimed invention, or its embodiment, be on sale in this country before the critical date. See King Instrument Corp. v. Otari Corp., 767 F.2d 853, 859-60 (Fed. Cir. 1985). A formal transaction for the sale of the patented product is not necessary to invoke the on-sale bar; a mere offer for the sale of an on-hand product to a single customer sufficiently satisfies the bar. See, e.g., id.; KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc., 997 F.2d 1444, 1451 (Fed. Cir. 1993); Buildex Inc. v. Kason Indus., Inc., 849 F.2d 1461, 1464 (Fed. Cir. 1988). "An offer to sell a later-claimed invention may be sufficient to invoke the bar whether the offer is accepted or rejected." UMC Elecs., 816 F.2d at 653. "While a bare, unexplained offer, not explicitly shown to be of the new invention, may be insufficient, the totality of the

13

circumstances must always be considered in order to ascertain whether an offer of the new invention was in fact made." King Instrument, 767 F.2d at 860. The on-sale bar requires that the on-sale equipment be operable at some level in order to embody the invention. See, e.g., In re Mahurkar, 71 F.3d 1573 (Fed. Cir. 1995); King Instrument, 767 F.2d at 861. In addressing the on-sale bar and reduction to practice the Federal Circuit specifically held that:

> [T]he on-sale bar does not necessarily turn on whether there was or was not a reduction to practice of the claimed invention. All of the circumstances surrounding the sale or offer to sell . . . must be considered and weighed against the policies underlying section 102(b).

UMC Elecs., 816 F.2d at 656.

Aoki presented evidence suggesting that the ASB 400 was demonstrated at the Chicago NPE show for commercial purposes. The declarations of Takeuchi, David Oas, and Richard Fitt support the conclusion that Aoki was attempting to sell the machine. Moreover, the additional evidence of price quotations (oral and written), as well as the follow-up calls to potential clients lend further support to this conclusion. Therefore, the court finds that the ASB 400 was presented in the trade show for the ultimate goal of selling the equipment.

FMT maintains that the on-sale bar doctrine imposes

14

different sets of requirements depending on who is commercializing the invention. See FMT's Reply to Aoki's Opp'n to Mot. for Prelim. Inj., at 9-12; FMT's Objection to Master's Report, at 32-33. If it is the inventor's own commercial activities prior to the critical date, then the on-sale bar applies directly and the patent is invalid. FMT urges that a third party's commercial activities invoke the on-sale bar only if they are conducted in a manner that would make the invention available to the general public. See also FMT's Supplemental Br. in Supp. of FMT's Mot. for Prelim. Inj., Decl. of Prof. Karl Jorda ("Jorda Decl."), ¶¶ 12, 13. In support of its proposition FMT cites to W.L. Gore & Assoc., Inc. v. Garlock, Inc., 721 F.2d 1540 (Fed. Cir. 1983); Wycoff v. Motorola Inc., 502 F. Supp. 77 (N.D. Ill. 1980);[13] and Professor Jorda's testimony.[14]

---

[13]In this case the district court held that Motorola's sale of technology to the government did not constitute an on-sale bar because the invention was sold to the government under a restricted and secretive contract and therefore was not exposed to the public. The court finds this case to be factually too dissimilar to the case at bar to provide persuasive authority in support of FMT's position.

[14]FMT's argument is based on the policies underlying § 102(b). It urges that the offer for sale by a third party must explicitly set out and provide for public inspection of the novel features of the invention and that anything short of this constitutes secret, confidential, and non-public use. FMT does not provide case law to support its conclusion and in fact the case law appears to support the opposite proposition. "The policies underlying the on-sale bar . . . concentrate on the attempt by the inventor to exploit his invention, not whether the

15

In Gore, an inventor, Cropper, sold his machine to Budd, who at some point used it to produce and sell PTFE thread seal tape - the machine's product.  See Gore, 721 F.2d at 1545-46.  A confidentiality agreement between Budd and Cropper prevented Budd from disclosing the nature of the invention to anyone but his employees.  See id. at 1549.  Dr. Gore, a rival inventor not in privity with Cropper, applied for a patent on the technology embodied in Cropper's machine which he had independently discovered.  See id.  On the issue of whether the third party sale invoked the on-sale bar against Dr. Gore, the court held that pre-critical-date secret use by a third party did not invoke the on-sale bar.  The court reasoned that "if Budd offered and sold anything, it was only tape, not whatever process was used in producing it. . . . [T]here was no evidence . . . that the public could learn the claimed process by examining the tape."  Id. at 1550.

The Gore case, while providing some support for FMT's proposition, is different in a fundamental respect from this

_____

potential purchaser was cognizant of the invention.  Accordingly, the purchaser need not have actual knowledge of the invention for it to be on sale."  King Instrument, 767 F.2d at 860.  The court declines to adopt FMT's position in light of contrary binding precedent.

16

case.  In Gore, the equipment which embodied the invention was kept secret and only the final product was offered for sale, whereas in this case Aoki did not maintain the process or its final product as a secret but rather demonstrated the ASB 400, while operating, during the NPE trade show.  Aoki also handed out brochures that explained and schematically described the stretch/blow process.  On this evidence, the court finds it unlikely that pertinent information would have been withheld by sales agents who had traveled to Chicago to sell the equipment. The question of whether a potential customer at the NPE trade show received enough information to ascertain the nature of technology used in the ASB 400 may ultimately be a question of fact.  However, for the purpose of this preliminary injunction motion, FMT has not overcome Aoki's showing that the ASB 400 was on sale prior to the critical date.

FMT also argues that the many breakdowns and malfunctions of the ASB 400 during the NPE trade show made it less than fully operational, and as such, the demonstration of such equipment did not satisfy the reduction to practice requirement of the on-sale bar.[15]  Courts have extensively discussed reduction to practice as it pertains to the on-sale bar doctrine.  See UMC Elecs., 816

---

[15]The type and frequency of each break-down was recorded by Takeuchi and the record has been introduced into evidence.

F.2d at 656; <u>King Instrument</u>, 767 F.2d at 861; <u>see also</u> <u>Mahurkar</u>, 71 F.3d at 1577. Any inquiry to ascertain the operability of the equipment for the purposes of reduction to practice takes into account the totality of circumstances. <u>See</u> <u>UMC Elecs.</u>, 816 F.2d at 656. A finding of perfect operation is unnecessary as long as the equipment properly embodied the invention and was capable of producing some measurable results. <u>See, e.g.</u>, <u>id.</u> at 647.

In this case, the evidence tends to show that the ASB 400 was operable at the time of the NPE trade show. The viewers of the NPE trade show were provided with plastic bottles that were produced during the show. <u>See, e.g.</u>, Decl. of Oas; Decl. of Fitt; Decl. of Takeuchi.[16] The demonstration of the ASB 400 in the Nissei Exhibit was for commercial purposes, and as evidenced by the above declarations, Nissei was prepared to enter into purchasing negotiations. The court finds it unlikely that all of these efforts were made to sell inoperable or incomplete equipment. Therefore, for the purposes of the on-sale bar the court finds that the ASB 400 adequately embodied the invention at

---

[16]Even when viewed with careful scrutiny due to his close involvement in developing and selling the ASB 400, <u>see</u> <u>Carella v. Starlight Archery & Proline Co.</u>, 804 F.2d 135, 138 (Fed. Cir. 1986), the declaration of Takeuchi seems well grounded in facts as it is supported with numerous documents, exhibits, and a video tape.

time of the NPE demonstration.[17]

Finally, FMT argues that because the price quotations expressly excluded the parison's price, the parison was not being offered for sale and therefore the Marcinek patents are not defeated. See FMT's Reply to Aoki's Opp'n to Mot. for Prelim. Inj., at 15. It is standard manufacturing practice for the price of certain integral parts of equipment to be excluded in the initial price quotation. Cf. Weatherchem Corp. v. J.L. Clark, Inc., 937 F. Supp. 1262, 1271-72 (N.D. Ohio 1996) (describing process by which a custom mold is developed to match customer's precise specifications). Often the reason for this is either that the particular excluded part is to be designed by another firm, or its cost is contingent on the customer's specific requirements. Given the technology involved in the bottle manufacturing industry, and the fact that each of the ASB 400

---

[17]FMT also contends that the on-sale bar should not affect the validity of the Marcinek patents because the subject of said patents, i.e. the parison and the core-rod assembly, were not displayed or conveyed at the show. FMT explains that the public did not come to believe that the claimed Marcinek inventions were freely available through the ASB 400 because the parisons were not displayed, they were not obvious from the machine's operation, and the literature provided by Nissei did not illustrate the core-rod assembly of the Marcinek invention. This argument fails for the same reasons that FMT's argument that Aoki's actions at the NPE show did not satisfy the requirements of the on-sale bar fails. See supra note 12 and accompanying text.

core-rod assemblies would have had to be customized to the particular customer's requirements, it is consistent with industry practice for Aoki to exclude the core-rod assembly's price from any price quotations that were given. That is not to say that the machines were not ready for sale, or that Aoki had not developed the proper preform technology. As indicated in the brochures handed out during the trade show, the process of using the preform to make bottles was operably developed, meaning that although it was not perfect, it was demonstrably operable for the purposes of the show. See In re Mahurkar, 71 F.3d 1573, 1577 (Fed. Cir. 1995). Therefore, the court finds that under § 102(b), Aoki had developed the ASB 400 at the time of the NPE trade show sufficiently to invoke the on-sale bar.

### (ii) Public Use Bar

FMT takes the position that the "public use" and the "on-sale bar" have two different requirements and that the master arrived at an erroneous conclusion by conflating the two. See FMT's Obj. to Master's Report, at 15. Both the on-sale bar and the public use doctrines are rooted in § 102(b), as well as in the principle that once something enters the pubic domain it is dedicated thereto and should not be taken away by a patent. See Lough v. Brunswick Corp., 103 F.3d 1517, 1524 (Fed. Cir. 1997).

20

In other words, once an invention is dedicated to the public,[18] it belongs to the public and cannot be protected by a patent. The inventor has a grace period of one year after entering the public domain to file a patent application. The two doctrines, though not identical, are closely related. FMT has not demonstrated that the master committed any error by treating the doctrines together particularly in view of the facts of this case.

In this case Aoki maintains that the NPE trade show display of the ASB 400 prior to the critical date amounts to a public use for the purposes of § 102(b), and therefore the Marcinek patents are invalid, not only based on the on-sale bar, but also based on the public use doctrine.

In evaluating whether the public use bar invalidates a patent, the court must consider whether the totality of the circumstances surrounding the public use comports with the policies underlying the public use bar. See, e.g., Tone Bros., Inc. v. Sysco Corp., 28 F.3d 1192, 1198 (Fed. Cir. 1994).[19]

---

[18]The word "public" as used in this context refers to those who have ordinary skill in the art, and not necessarily to the general public. See UMC Elecs., 816 F.2d at 655.

[19]As with the on-sale bar, the Federal Circuit has identified at least four policy reasons for the public use bar:

> (1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to

In this case, FMT suggests that the key element in dispute is whether the public gained possession of the invention -- that is, whether the public came to fully comprehend the invention during the trade show demonstration. FMT insists that third-party public use defeats the patent only if it enables the public to replicate, or at least understand, the concept of the invention. Even if the court were to adopt this argument,[20] the court finds that Aoki's trade show presentation of the ASB 400 was enabling for the purpose of public use. The totality of evidence, as discussed supra in the on-sale section, indicates that the public most likely came to believe that it was in possession of the invention. The use of the ASB 400 was not experimental but

_____

        believe are freely available; (2) favoring the prompt
        and widespread disclosure of inventions; (3) allowing
        the inventor a reasonable amount of time following
        sales activity to determine the potential economic
        value of a patent; and (4) prohibiting the inventor
        from commercially exploiting the invention for a period
        greater than the statutory prescribed time.

Tone Bros., 28 F.3d at 1198.

        [20]For the purpose of defining and evaluating public use, the Supreme Court has held: "It is not public knowledge of [an] invention that precludes the inventor from obtaining a patent for it, but a public use or sale of it." City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 136 (1877) (emphasis supplied). This definition was acknowledged and applied in TP Lab., Inc. v. Professional Positioners, Inc., 724 F.2d 965, 970 (Fed. Cir. 1984).

rather it was in public, and it was conducted for the purpose of selling the equipment. See also TP Labs. v. Professional Positioners, Inc., 724 F.2d 965, 970 (Fed. Cir. 1984). Given the manufacturer's literature, technical presentations, and discussions with visitors, it is unlikely that Aoki was concealing the invention. The court finds that the trade show public had reason to believe either that it had possession of the invention or that it was able to apply the technology.[21] Therefore, the court finds that Aoki's challenge under the public use bar has not been successfully rebutted.

(iii)  Prior Art Publications and Inequitable Conduct

Aoki also challenges the validity of the patents-in-suit based on prior patents and publications. In this regard Aoki introduces A. James Richardson's testimony that

> (1) all three of the patents-in-suit are invalid under § 102(a) over prior art that has never before been considered by the USPTO or any court, (2) that this prior art was known to the inventor and his attorney (FMT's counsel in this lawsuit), and (3) that the inventor and his attorney concealed the prior art from the USPTO during prosecution, thereby rendering the

---

[21]FMT alleges that even if ASB 400 was demonstrated, the preforms were maintained confidentially and the public did not come into possession of them. This allegation is contrary to the testimony of Fitt, Oas, and Minoru Ohkubo, who testified that the preforms were handed out at the NPE trade show. See Master's Report, ¶ 144.

patents unenforceable for inequitable conduct. Aoki's Opp'n to FMT's Mot. for a Prelim. Inj., at 19. Specifically, in its opposition to FMT's motion for a preliminary injunction, Aoki challenges the validity of the Marcinek patents based on U.S. Patent No. 688,924, the Marcinek publications, and the Japanese Laid Open Utility Model 52-111767 (JP 52-111767). Because the court finds Aoki's challenge to validity persuasive, it will not engage in further discussion of Aoki's alternative challenges.

### 2.  Infringement

To demonstrate that it is entitled to a preliminary injunction, FMT has the burden of establishing that it has a reasonable likelihood of success in showing that Aoki is infringing its patents.  FMT argues that it has met this burden because of its history of successful litigation in FMT v. Constar and FMT v. Nissei.  FMT also introduces the testimony of Frederick J. Feddersen and Professor John D. Muzzy.  Feddersen's declaration identifies several key documents and exhibits. Professor Muzzy's declaration discusses the Marcinek patents and concludes that, in his opinion, the Twin Mountain mold and core-rod combination used in Aoki's equipment includes each and every element of claim 1 of the Marcinek patents.  See FMT's Mem. in

24

Supp. of Mot. for Prelim. Inj. [against Twin Mountain], Decl. of Prof. Muzzy, at 10, 11, 13. Based on these declarations, as well as its prior successful litigations, FMT argues that it is likely to succeed in showing infringement.[22]

Aoki challenges FMT's position by arguing that an important element of the Marcinek patents - the rapid transition between the bottom and the side walls - is missing from the Twin Mountain preforms. To this end, Aoki supplied the declaration of Richardson. Richardson testified to non-infringement by measuring the bottom and the annular corners of the preform to determine whether there is a "rapid transition." These measurements were compared with the diagram depictions of the Marcinek preform as they appear in the patents. FMT protests that this evidence is improper and was not allowed in the Constar trial.

After evaluating the evidence, the master held that FMT had failed to rebut the testimony that such a rapid transition in thickness does not occur in the accused parison. Particularly, the master found FMT's evidence to be mere assertions of the

_____

[22]In this regard, FMT relies on Hybritech, 849 F.2d at 1452, for the proposition that the history of prior adjudications should be given considerable weight. The court gives due consideration to this history where appropriate, but must exercise its own judgment rather than substituting the judgment of another court.

experts' opinion, not supported by objective facts or analysis, which failed to effectively rebut Aoki's evidence.

"To establish infringement, every limitation set forth in a patent claim must be found in an accused product or process exactly or by a substantial equivalent." Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1535 (Fed. Cir. 1991). The patent infringement inquiry is a two step process. "First, the meaning of the claims in issue must be determined by a study of all the relevant patent documents. Secondly, the claims must be read on the accused structures." Autogiro Co. of America v. United States, 384 F.2d 391, 401 (Ct. Cl. 1967). The first step, claim construction, is an issue of law for the court, and the second step, the infringement determination, is a question of fact. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 978 (Fed. Cir. 1995).

In the case at bar, the parties seem to adhere, at least superficially, to the claim construction of the master assigned in the Constar case.[23]

---

[23]The controversy revolves primarily around claim 1 of the '620, '369, and '530 patents. Claim 1 of the '620 patent, which is at the center of the controversy, reads as follows:

1. A plastic parison

having a bottom wall portion, as side wall portion, a shoulder portion and a neck finish,

26

said bottom wall portion having a flat area and

there being an annular corner area joining said bottom wall and sidewall portions,

said bottom wall portion having a thickness less than the thickness of said sidewall portion with

there being a rapid transition from said flat of said bottom wall to said sidewall portion with

said sidewall thickness being substantially constant from said annular corner area to said shoulder portion.

(paragraphing and emphasis supplied).  Claim 1 of the '530 patent reads as follows:

1.  A plastic mold-core rod combination for forming an injection molded plastic parison

having a bottom, a sidewall, a shoulder, and a neck finish

comprising a female parison mold having a flat area at the bottom surface thereof and a sharply threaded annular corner surface extending from said flat at said bottom surface into a sidewall surface and terminating at a neck finish, and

a core rod having a flat area at the end portion thereof and

a sharply tapered annular corner surface extending from said flat into a sidewall surface;

said flat at said end portion,

said sharply tapered annular corner surface and said sidewall surface of said core rod, and

said flat at said at said bottom surface,

sharply tapered annular corner surface and sidewall surface of said mold constructed and arranged to mate and form a

27

cavity having a bottom area thickness, a sidewall area thickness and an annular corner area thickness connecting said bottom and sidewall areas,

said bottom area thickness and annular corner area thickness being less than said sidewall area thickness and having a rapid transition from the thickness at the middle of said bottom cavity area to said sidewall cavity area of greater thickness,

said sidewall thickness being substantially constant from said annular corner surface to the shoulder.

(paragraphing and emphasis supplied). Finally, claim 1 of the '369 patent reads as follows:

1. Process of manufacturing a molecularly oriented plastic bottle comprising the steps of

(1) providing an injection molded plastic parison having a bottom wall portion, a sidewall portion, a shoulder portion, and a neck finish,

said bottom wall portion having a flat area and there being an annular corner area joining said bottom wall and sidewall portions,

said bottom wall portion having a thickness less than the thickness of said sidewall portion with

there being a rapid transition from said flat of said bottom wall to said sidewall portion with

said sidewall thickness being substantially constant from said annular corner area to said shoulder portion;

(2) positioning said parison in a stretch/blow mold; and

(3) stretch/blowing said parison in said blow mold to form a finished bottle.

28

In fact, the dispute is not over claim construction but rather over the issue of whether Aoki's accused preform has the "rapid transition" element.

In this regard, the master held that FMT had failed to establish the existence of a rapid transition element in the accused parison.  See Master's Report, ¶ 69.  The court finds the evidence inconclusive at best.  Exhibits 41, 44, and 49, which form the basis of FMT's argument, are Computer Aided Drafting ("CAD") designs.  They lack orientation, proper dimensions, and other technical data that are standard to a technical drawing.  See Sterling Millwrights, Inc. v. United States, 26 Ct. Cl. 49, 54-55 (Ct. Cl. 1992) (discussing means used to "depict essential minutiae" on detail drawings in steel industry); Monovis, Inc. v. Aquino, 905 F. Supp. 1205, 1214-15 (W.D. N.Y. 1994) (discussing differences between preliminary, layout, or conceptual drawings on the one hand and detailed design drawings including "critical information such as tolerances and clearances" on the other).[24]

_____

(paragraphing and emphasis supplied).

[24] In fact, these exhibits do not even contain a drafting identification box that would appraise the viewer of the drawing's title, date of creation, and the draftsperson's name or affiliation.  Moreover, the dimensional representation in the exhibits is not consistent with the proper state of the art in drafting technology.  See Master's Report, ¶¶ 69, 70.

In addition, the experts' testimony as presented is conclusory and uncorroborated.[25]

On the other hand, Aoki's use of the schematics in the specification section of the Marcinek patents is questionable at best.[26]  In an attempt to persuade the court of non-infringement, Richardson uses the patent drawings to define the rapid transition limitation and show that it is not present in the accused preforms.  The Federal Circuit's predecessor court has held that the drawing in a specification may be used in a manner similar to the written specification in order to provide evidence relevant to claim interpretation.  See Autogiro, 384 F.2d at 398. In this case Richardson's use of the drawing is not per se impermissible.  However, the interpretation of the rapid transition element by the visual examination of the patent drawing and its comparison to the Twin Mountain preforms is

---

[25]FMT admits that the declarations of Robert W. Gutekunst and Professor Muzzy are opinion testimony.  Nonetheless, it insists that the court should accept them as authoritative without any corroboration or specific detail for the basis of their opinion.  See FMT's Obj. to Master's Report, at 7.  The court notes that in this respect, FMT's proffered expert opinions are no more authoritative than Aoki's.

[26]Aoki's expert witness, Richardson, represented Constar in the FMT v. Constar litigation.  He is not a practicing scientist or engineer and his technical knowledge of the subject matter is attributed to his experience in drafting, prosecuting, and litigating similarly situated patents.

ultimately a question of fact. See Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed. Cir. 1995) (fact finder conducts visual examination to determine substantial similarity). The court is not prepared to address this question at this time given the state of the evidence. Although Richardson's method of interpreting the rapid transition element may be less than accurate and subject to different interpretations, as the master has noted, it is the only practical evidence presented to quantify the similarity between the patented subject matter and the accused preforms. Given the fact that FMT has the burden of showing its likelihood of success at trial, FMT, in order to prevail, must adduce more than a criticism of Aoki's method to rebut Aoki's evidence.

B.    Irreparable Harm, Balance of Hardship, and Public Interest

In a motion for preliminary injunction, the movant must show not only a reasonable likelihood of success on the merits, but also irreparable harm, which includes the lack of an adequate remedy at law. Where the patent's validity and continuing infringement have been clearly established, immediate irreparable harm is presumed. See, e.g., H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 390 (Fed. Cir. 1987), overruled on

31

other grounds by <u>Markman v. Westview Instruments</u>, 52 F.3d 967, 977 (Fed. Cir. 1987); <u>Smith Int'l v. Hughes Tools Co.</u>, 718 F.2d 1573, 1581 (Fed. Cir. 1983). This presumption is not a <u>per se</u> rule, and is rebuttable. <u>See</u> <u>H.H. Robertson</u>, 820 F.2d at 390.

In this case, the validity of the Marcinek patents has been seriously challenged. FMT does not contest the master's finding on irreparable harm, the balance of hardships, and the public interest. Indeed, it adopts the master's reasoning by stating that:

> [I]f the Court finds FMT is likely to succeed on the merits . . . the Court should find irreparable harm based on the presumption of irreparable harm and that the balance of hardship and the public interest favors entry of an injunction.

FMT's Obj. to Master's Report, at 35.

Aoki takes the position that there is no irreparable harm because: (1) FMT is not in competition with Aoki, and its only claim of relief is monetary; and (2) FMT's delay in seeking relief undermines the irreparable harm request. <u>See</u> Aoki's Opp'n to FMT's Mot. for a Prelim. Inj., at 2. The Federal Circuit has held that irreparable harm was not present where a patent holder was willing to grant a license, was inactive in the market, delayed seeking relief, and did not show that it could not be adequately recompensed by money damages. <u>See</u> <u>High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.</u>, 49 F.3d 1551,

32

1556-57 (Fed. Cir. 1995). FMT does not manufacture bottles, nor does it intend to compete with Aoki in selling manufacturing equipment. The extent to which its interest can be harmed is primarily financial. At the conclusion of this case, should FMT prevail, the harm suffered by FMT can be compensated by an award of damages. Aoki's assets appear to be sufficient to cover any judgment.

The third and fourth requirements for a preliminary injunction require the court to examine which party would suffer a greater hardship in the presence or absence of an injunction and whether the public interest would be preserved by the issuance of an injunction. The court having reviewed this case de novo, finds the master's legal and factual analysis of the balance of hardships and the public interest to be comprehensive and accurate. The parties have not raised any substantial objection to the master's findings on these issues. The court, accordingly, adopts the master's findings of fact and conclusions of law with respect to these elements.

III.  Other Objections to the Master's Report

Aoki has raised several objections to various aspects of the master's report. In part, Aoki contends that the form of the master's report is improper because it does not set forth

33

findings of fact and conclusions of law.  Aoki's argument is misplaced because, although the master's report does not expressly designate specific items as findings of fact or conclusions of law, the report contains explicit and extensive detail as to both the factual bases upon which it rests and the legal reasoning on which it relies.  Moreover, FMT has raised additional objections.  However, having reviewed the parties' remaining objections, the court finds them to be without merit and unworthy of discussion.  <u>See</u> <u>Rodriguez-Hernandez v. Miranda-Velez</u>, 132 F.3d 848, 860 (1st Cir. 1998).

<u>Conclusion</u>

For the foregoing reasons the defendant's motion for preliminary injunction (document no. 8) is denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

March 23, 1998

cc:  Warren C. Nighswander, Esquire
     Wayne M. Smith, Esquire
     Garry R. Lane, Esquire
     Theodore A. Breiner, Esquire
     David Conlin, Esquire

34