Charles F. MARTIN, Plaintiff-Appellant Cross-Appellee,

v.

NORMAN INDUSTRIES, INC., Defendant-Appellee Cross-Appellant.

No. 82–3414.

United States Court of Appeals, Fifth Circuit.

Feb. 27, 1984.

Matthews & Burgess, Guy E. Matthews, Houston, Tex., for plaintiff-appellant cross-appellee.

Ward, Lalos, Leeds, Keegan & Lett, Francis A. Keegan, Douglas N. Larson, Washington, D.C., for defendant-appellee cross-appellant.

Before CLARK, Chief Judge, GEE and POLITZ, Circuit Judges.

POLITZ, Circuit Judge:

Charles F. Martin sued Norman Industries, Inc. under 35 U.S.C. § 271, alleging infringement of United States Patent No. 4,022,028 (the '028 patent) issued to Martin on May 10, 1977. The '028 patent covers an underwater pipe trenching machine cognomened "Mole II." Following a bench trial the district court rendered judgment for Norman Industries, finding the '028 patent invalid under 35 U.S.C. § 102(b) because of public use and sale of the Mole II more than one year prior to the date Martin filed his patent application. The court denied Norman Industries' motion for attorneys' fees under 35 U.S.C. § 285. Both parties appeal. We affirm.

*Facts and Procedural Background*

In April 1969, Martin licensed Oceanonics, Inc. to use his United States Patent Nos. 3,429,131 and 3,429,132 in the construction of underwater pipe trenching machines. Oceanonics built a machine named "Mole I" and used it during August 1969 to bury pipelines for United Gas Pipeline Company at locations in the Gulf of Mexico.

Practical application and use indicated the need for refinements in design and led to the development by Oceanonics and Martin of an improved machine known as the "Mole II." The Mole II was able to move along an underwater pipeline of varying circumference by use of a newly developed tensioned and resiliently urged arm. The Mole I and other earlier underwater trenching machines were unable to traverse breaks in the concrete coating of underwater pipelines, a capability which required a resilient means of travel. Oceanonics completed construction of the Mole II in October 1970.

In September 1970 Oceanonics contracted with Tennessee Gas Pipeline Company to use the Mole II to bury 7.12 miles of six-inch pipeline in the Gulf of Mexico. When Martin visited the Oceanonics shop in Houston to see the completed Mole II, he was informed of the Tennessee Gas contract.

On October 18, 1970, Oceanonics transported the Mole II from Houston to Morgan City, Louisiana. There, the Mole II was loaded onto a barge for transportation to the Cameron Block area in the Gulf, where the Tennessee Gas pipeline was located.

On October 30, 1970, while the Mole II was still on the barge at Morgan City awaiting its trip to the Tennessee Gas job-site, Oceanonics held a "crawfish boil"[1] nearby. Oceanonics invited representatives of approximately 100 potential customers, including Exxon Corporation, Gulf Oil Company, Mobil Oil Corporation, Tennessee Gas, Transco Exploration Company, and Shell Development Company, to see the Mole II. Oceanonics demonstrated the capabilities of the Mole II by suspending it from an A-frame and engaging its cutter heads and drive rollers. Oceanonics offered to sell or lease the Mole II to its guests for future commercial underwater trenching projects.

Shortly thereafter, the Mole II was transported to the situs of Tennessee Gas's pipeline. Technicians attached the machine to the pipeline on November 5, 1970, but adverse weather conditions forced them to disengage it. The following day, the Mole II was reattached to the pipeline and the tender barge, with its hydraulic and other support lines in place, was positioned ahead of the trenching machine as burying operations began. Although Oceanonics encountered some problems adjusting the machinery, the Mole II buried between 100 and 200 feet of pipe before severe weather forced a suspension of operations.

On November 7, 1970, the weather in the Gulf became so inhospitable to the trenching operation that Oceanonics was forced to move the Mole II to a safe harbor at Cameron, Louisiana. A crane boom collapsed during unloading operations in Cameron, and the Mole II was dropped and severely damaged. As a consequence, Oceanonics was unable to complete its contractual obligation to bury the rest of Tennessee Gas's 7.12 miles of pipeline. Oceanonics settled its claim against Tennessee Gas for the small amount of work that it had been able to perform before the elements and chance interfered.

On December 31, 1971, more than one year after the Morgan City crawfish boil and Oceanonics' embryonic trenching operation for Tennessee Gas, Martin applied for a patent to cover the Mole II.

Martin's suit for injunctive and monetary relief alleged that Norman Industries man-

---

1. A crawfish boil is a popular pastime in Louisiana. Guests are invited on a social basis or, not infrequently, for a mix of business and pleasure, to eat boiled crawfish, either prepared on the scene or catered, along with potatoes, corn, mushrooms and onions cooked in the "boil water," all aided by appropriate libations. Invitations to a crawfish boil are seldom declined. This indigenous south Louisiana activity is a very effective means of collecting a crowd or audience for political, business, civic, religious, or social purposes.

ufactured an underwater trenching machine that incorporated the unique qualities of the Mole II's patented, resiliently urged arm. The trial judge found that the '028 patent was invalid under 35 U.S.C. § 102(b)[2] because the Mole II had been in public use and on sale more than one year before Martin filed his patent application. Specifically, the court found that Oceanonics' demonstration and commercial offering of the Mole II at the Morgan City crawfish boil constituted a public use and that Oceanonics' partial performance of its contract with Tennessee Gas constituted a public use and sale within the meaning of 35 U.S.C. § 102(b). Based on its finding that Oceanonics' primary motive in contracting with Tennessee Gas was to earn a profit, the trial court further held that the burying of the small amount of Tennessee Gas pipe was not an experimental activity.

Norman Industries sought an award of attorneys' fees under 35 U.S.C. § 285[3] on the ground that Martin had acted in bad faith and had made material misrepresentations to the Patent Office during the pendency of his '028 patent application. The district court did not address this issue in its memorandum opinion.

Martin appeals from the district court's finding of patent invalidity. Norman Industries cross-appeals from the court's failure to award attorneys' fees.

### Analysis

■ We are mindful of the scope of appellate review. The district court's findings of public use and sale, albeit closely related to its legal conclusions, are findings of fact. *See Bourne v. Jones,* 207 F.2d 173 (5th Cir.1953). As in all other cases, such findings in patent cases are protected by the clearly erroneous shield of Fed.R.Civ.P. 52(a). *Bird Provision Co. v. Owens Country Sausage, Inc.,* 568 F.2d 369 (5th Cir.1978).

Further, where the district court's findings are based substantially and expressly upon credibility evaluations, we are constrained to extend special deference.

■ Martin asserts that the district court's findings of prior public use and sale are clearly erroneous. We do not agree.

First, the demonstration at Morgan City was a public use. It was a marketing effort designed to advertise the capabilities and availability of the Mole II. Oceanonics was seeking business from this group of potential customers. It is well established that "a single instance of competitive exploitation of the invention ... prior to the critical date can raise both the 'on sale' and 'in public use' bars to patentability." *In re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 277 (5th Cir.1974).

■ Second, the court's finding that Oceanonics' partial performance of its contract with Tennessee Gas constituted a public use and sale is similarly supported by the evidence. As we held in *Kardulas v. Florida Machine Products Co.,* 438 F.2d 1118, 1124 (5th Cir.1971), "a single use of an invention for commercial purposes constitutes a public use." The record reflects that Oceanonics contracted with Tennessee Gas to bury 7.12 miles of underwater pipeline at a price of $3.90 per foot. Oceanonics incurred substantial expenses in trucking the Mole II from Houston to Morgan City and then in transporting it by barge to the Cameron Block area. Oceanonics performed trenching operations until the foul weather and accidental damaging forced a halt. The trial court's finding that Oceanonics was guided by a profit motive and was not engaged in research in the partial performance of its contract with Tennessee Gas is not clearly erroneous.

■ Martin alleges further that the record does not support any of the court's

---

**2.** 35 U.S.C. § 102 provides in pertinent part: A person shall be entitled to a patent unless—
   (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to

the date of the application for patent in the United States, ...

**3.** 35 U.S.C. § 285 provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

findings of prior public use and sale because there was no evidence that the resilient means described in Claim 31 of the '028 patent[4] were actually used either during the demonstration at Morgan City or in the course of the aborted trenching operation. We do not agree. Pelican Marine divers who examined the trenching site reported that the stretch of pipeline buried by the Mole II had variations in its circumference due to breaks in the pipe's concrete coating. In light of the district court's finding that the Mole II buried between 100 and 200 feet of pipe, it was reasonable for the court to infer that the resilient means had aided the machine's progress along the uneven pipeline. Further, although the new machine's resilient means could not be observed in actual operation during the Morgan City exhibition because the Mole II was suspended in the air from an A-frame, Oceanonics explained the operation of the new feature. The machine's ability to traverse pipeline of uneven circumfrence was its principal selling point.

### Attorneys' Fees

Norman Industries claims that the district court erred when it failed to award attorneys' fees under 35 U.S.C. § 285. We are not persuaded. Although the court's memorandum opinion is silent on the subject, our review of the record leads us to the conclusion that the exceptional circumstances required by § 285 did not exist. Much of the evidence relating to fraud and bad faith is conflicting. Indeed, on the state of the evidence in this record, we could not permit a fee award to stand.

The judgment of the district court is in all respects AFFIRMED.

4. Claim 31 provides:
   An underwater trenching apparatus for burying a pipeline or the like beneath the bottom of a body of water comprising:
   a frame for positioning over the pipeline to be buried;
   jet means supported by said frame, comprising a plurality of vertically arranged nozzles for digging a trench in said bottom for burying said pipeline;
   a set of rollers secured to said apparatus and contacting said pipeline to direct said apparatus along said pipeline, drive means to drive at least one of said first rollers for movement of said apparatus along said pipeline;
   *resilient means positioned between at least one of said rollers and said frame to permit movement of said roller toward and away from the axis of said pipeline while following variations in the circumference in said pipeline.*
   (emphasis added).