**SYSTEM MANAGEMENT ARTS INCORPORATED, Plaintiff,**

v.

**AVESTA TECHNOLOGIES, INC. and David Zager, Defendants.**

No. 97 Civ. 8101(RWS).

United States District Court,
S.D. New York.

March 3, 2000.

Proskauer Rose, New York City, by Nancy Kilson, Kenneth Rubenstein, Anthony C. Coles, John C. Stellabotte, of counsel, for plaintiff.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, by Martin Flumenbaum, Eric S. Goldstein, Steven C. Herzog, Robert C. Weisz, of counsel, for defendants.

## OPINION

SWEET, District Judge.

Plaintiff System Management Arts Incorporated ("Smarts") has moved, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, for summary judgment (1) excluding "Delphi" software developed by Morgan Stanley & Co., Inc. ("Morgan Stanley") as relevant prior art in this patent infringement action, and (2) dismissing the Second, Fourth, and Fifth counterclaims of defendants Avesta Technologies, Inc. ("Avesta") and David Zager ("Zager") (collectively the "Defendants"). Smarts

has also moved, pursuant to Rule 56(e), Fed.R.Civ.P., to strike various portions of the record submitted by Avesta. For the reasons set forth below, these motions shall be granted in part and denied in part.

### The Parties

Smarts is a corporation organized under the laws of the State of Delaware.

Avesta is a corporation whose principal place of business is in the State of New York.

Zager serves as Avesta's Chief Technology Officer, and resides within the State of New York.

### Facts and Prior Proceedings

In this aggressively litigated action, the parties agree on precious few facts underlying their respective claims and counterclaims. Nevertheless, the facts set forth below are taken from the parties' Rule 56.1 statements, affidavits, and exhibits, and are not in dispute except where otherwise indicated.

Smarts and Avesta are both corporations that develop and sell software designed to manage information technology infrastructure. In the main, the parties' respective products are designed to assist the maintenance of networks, to facilitate system troubleshooting, and to identify both actual and potential problems with computer systems. Avesta and Smarts have, at times, competed for the same business.

Smarts is the assignee of U.S. Patent No. 5,528,516 (the "516 Patent"), as well as U.S. Patent No. 5,661,668 (the "668 Patent"). The 516 Patent was filed in May of 1994, and the 668 Patent was filed in July of 1996. Despite this later filing date, the 668 Patent application was a continuation of the initial application for the 516 Patent.

Avesta was incorporated in 1996, and a number of its employees and principals are former Morgan Stanley employees. Avesta has developed a computer program, called "Trinity," that is competitive in a number of respects with Smarts' software.

Though the parties disagree concerning both timing and public disclosure, there is no disagreement that at some point Morgan Stanley developed a computer program called "Delphi" designed to model its network. Furthermore, a number of Avesta employees had previously been involved—directly or tangentially—with the development or maintenance of Delphi. The parties also do not dispute that, shortly before the incorporation of Avesta, defendant Zager visited Smarts on behalf of his then-employer Morgan Stanley to discuss matters related to systems management technology.

At an October, 1997 trade show known as "Interop," Smarts' president, Dr. Shaula Yemini ("Yemini"), had occasion to notice Zager at a booth run by Avesta, and viewed a portion of a demonstration concerning Trinity. Further observation was made by another Smarts employee, and the parties' respective employees engaged in what could best be described as "unpleasantries."

On October 31, 1997, Smarts filed suit, alleging that Trinity directly infringes upon Smarts' patents-in-suit, and that defendant Zager improperly appropriated confidential information obtained from Smarts during his visit on behalf of Morgan Stanley. Smarts' complaint asserts causes of action for patent infringement, unfair competition, breach of contract, interference with contractual relations, and unjust enrichment.

Avesta and Zager answered Smarts' complaint on December 10, 1997, asserting counterclaims for a declaratory judgment, unfair competition under the Lanham Act, "patent misuse," common law unfair competition, and for violations of Sections 349 and 350 of New York's General Business Law ("GBL"). The Defendants have contended, among other things, that Morgan Stanley's Delphi software would properly be considered "prior art" in this action, assuming Smarts' broad construction of its patents-in-suit, and that Smarts cynically

initiated the instant action in order to cripple Avesta.

Oral argument on these respective motions was heard on October 13, 1999 and October 20, 1999, at which time they were deemed fully submitted.

### Discussion

It is worth noting at the outset that, while the parties' briefing is voluminous, the issues presently before the Court are narrow. Neither the underlying meaning of the patents involved in this litigation are placed at issue by the instant motions, nor is the Court being called upon to render any decision regarding the occurrence of any infringement.

Rather, the principal questions presently before the Court are (1) whether a triable issue could exist as to whether a particular software program, Delphi, constitutes prior art, and (2) whether the record presently before the Court reveals any material dispute of fact concerning Avesta's counterclaims for unfair competition under the Lanham Act, common law unfair competition, and violations of GBL §§ 349, 350. Smarts professes that its receipt of the relief it presently seeks will enable it to proceed more economically, and without expending unnecessary efforts on irrelevant matters. The Defendants counter that Smarts' efforts are premature, and that the real reason for its motion with respect to Delphi is to facilitate an overly broad interpretation of its patent rights— an interpretation that would be especially problematic were Delphi to remain a potential prior art reference. Smarts has also moved, on evidentiary grounds, to strike various portions of the record developed by the Defendants, though the merits of that motion shall not be addressed separately from Smarts' primary motions for summary judgment.

As it has often been observed, summary judgment is appropriate only where the evidence is such that a reasonable jury could not return a verdict in favor of the non-moving party. *See Anderson v.* *Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under Rule 56(c), Fed.R.Civ.P., it shall be rendered "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits … show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Second Circuit has explained:

> "As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." However, where the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim.

*Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991) (*quoting Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (internal citations omitted)).

The Defendants have noted that Smarts' motion concerning Delphi is problematic, in that it is directed "only to the exclusion of a particular piece of evidence, and will not dispose of all or part of any claim or counterclaim asserted in this action." In this regard, they indicate that the motion is really a premature *in limine* motion improperly disguised as one for summary judgment.

Defendants' position is well-taken, in that the Defendants have asserted the existence a wide variety of other prior art in this action, and even the resolution of all Delphi-related defenses will not dispose of those claims connected to other prior art. However, whether characterized as a proper motion for summary judgment or as a motion *in limine*, Defendants will nevertheless be required to offer admissible evidence sufficient to create a genuine issue for trial. The parties have had ample opportunity for discovery, as well as for

the preparation of briefing materials, and the Delphi-related motion will be addressed on the merits.

## I. *Smarts is Not Entitled to Summary Judgment Excluding Delphi as Prior Art*

In their Second Amended Response to Smarts' Second Set of Interrogatories, the Defendants identified three statutory bases upon which they contend the Delphi software developed by Morgan Stanley constitutes "prior art" invalidating Smarts' patents-in-suit—subsections (a), (b), and (g) of 35 U.S.C. § 102. Smarts has seized upon this response, and presses that no triable issue exists with respect to invalidation under Section 102.

As Section 102 indicates:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

. . .

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

The Court has yet to evaluate any technical similarities between Delphi and Smarts' software, whether Delphi discloses all of the limitations of any patent claim at issue in this litigation, or whether the differences between Smarts' software and Delphi are such that the subject matter of Smarts' patent as a whole would have been "obvious" to a person having ordinary skill in the art. Smarts, nonetheless, contends that it is entitled to summary judgment, as Defendants Avesta and Zager have offered no corroborated evidence establishing that the Delphi software could constitute prior art under 35 U.S.C. §§ 102(a), (b), (g). Smarts presses that "even if [the] Defendants could prove that Delphi satisfies all limitations of any claim of the patents-in-suit or that the inventions in Smarts' patents are obvious in light of Delphi . . ., Defendants would be unable to show by clear and convincing evidence that Delphi qualifies as prior art. . . ."

More specifically, Smarts contends that Avesta and Zager have failed to offer any evidence that could establish that Delphi (1) was patented, available, or accessible to the public prior to the invention date of Smarts' patented software; (2) was in public use or on sale more than one year prior to the date of Smarts' initial patent application; or (3) was invented prior to Smarts' claimed invention, and was not abandoned, suppressed or concealed. Smarts additionally presses that the Defendants cannot rely upon the uncorroborated testimony of either interested Avesta personnel or non-interested Morgan Stanley employees to establish its claims of prior art under Section 102, and that Avesta's ultimate burden of demonstrating the invalidity of Smarts' patents by clear and convincing evidence must be considered in evaluating Smarts' present motions.

 Preliminarily, it is worth noting that patents are presumed valid by statute, and that " '[t]he burden is [therefore] on the party asserting invalidity to prove it with facts supported by clear and convincing evidence.' " *Finnigan Corp. v. International Trade Comm'n*, 180 F.3d 1354, 1365 (Fed.Cir.1999) (*quoting SSIH Equip., S.A.*

*v. United States Int'l Trade Comm'n*, 718 F.2d 365, 375 (Fed.Cir.1983)); *see Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1216 (Fed.Cir.1998). Therefore, though the Defendants certainly do not bear the burden of proving their entire case at this stage in the litigation, they are nevertheless obligated to come forward with evidence that, if credited, could satisfy that heightened standard of proof. *C.f. National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1189 (Fed.Cir.1996) ("In deciding a motion for summary judgment of invalidity the burden of proof must be considered.") (citing *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505).

■ Furthermore, as the Federal Circuit recently indicated in *Finnigan*, 180 F.3d at 1367–68, mere testimonial evidence concerning invalidating activities under Section 102 has been traditionally viewed with disfavor, and corroboration is required under that Section "regardless of whether the party testifying concerning the invalidating activity is interested in the outcome of the litigation ... or is uninterested but testifying on behalf of an interested party." *Id.* at 1367. This does not mean, of course, that the law requires that every last evidentiary detail be seconded by corroborative evidence. Moreover, there are no formalistic restrictions on the form of corroborative evidence. *See Transclean Corp. v. Bridgewood Servs., Inc.*, 77 F.Supp.2d 1045, 1072 (D.Minn.1999) ("The Court is aware of no restriction as to the form of ... corroborating evidence. Contemporaneous documents, which are prepared by the putative inventor, circumstantial evidence about the inventive process, and oral testimony of someone besides the claimed inventor, have been held to satisfy the corroboration rule.") (citations omitted). Instead, corroborative evidence must satisfy a "rule of reason" analysis. *See Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed.Cir.1998); *see also Finnigan*, 180 F.3d at 1368–69 (contrasting question of necessity of corroboration

*vel non* with question of adequacy of corroborating evidence, "a distinct inquiry involving an assessment of the totality of the circumstances, including consideration of the 'interest of the corroborating witness in the subject matter of the suit.'") (quoting *Woodland Trust*, 148 F.3d at 1371); *Trans Union Corp.*, 7 F.Supp.2d at 1072 ("The 'rule of reason' means only that the Trial Court will conduct an evaluation of all pertinent evidence so that a sound determination of the credibility of the alleged inventor's story can be reached.").

■ As the United States Court of Appeals for the Federal Circuit explained in *Woodland Trust*, 148 F.3d at 1368:

Section 102(a) establishes that a person can not patent what was already known to others. If the invention was known to or used by others in this country before the date of the patentee's invention, the later inventor has not contributed to the store of knowledge, and has no entitlement to a patent.

*Id.* at 1370. In order to invalidate a patent based on prior knowledge or use pursuant to Section 102(a), that knowledge or use must first have been "available" or "accessible" to the public. *See id.; Carella v. Starlight Archery*, 804 F.2d 135, 139 (Fed.Cir.1986). Such accessibility is measured from the date of the claimed prior art's invention, and need not be universal. Courts have held that Section 102(a) requires only that the invention be accessible to the public, not that the public actually knew of or used the invention at issue. *See Levi Strauss & Co. v. Golden Trade, S.r.L.*, 1995 WL 710822, at *17 (S.D.N.Y. Dec.1, 1995).

Similarly, invalidation of a patent may occur under Section 102(b) if it is established, by clear and convincing evidence, that a "public use" of the prior art at issue occurred more than a year before the application for the challenged patent was filed. *See Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1197 n. 4 (Fed.Cir.1994); *Articulate Sys., Inc. v. Apple Computer,*

53 F.Supp.2d 62, 75 (D.Mass.1999) The "critical date" referenced in Section 102(b), unlike that used in Section 102(a), is one year prior to the filing of the patent application in question.

■ While "public use" of an invention has been defined as "any use of that invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor," *In re Smith,* 714 F.2d 1127, 1134 (Fed.Cir.1983), courts have considered a wide variety of factors when determining whether the use of an invention was indeed "public" within the meaning of Section 102(b). *See Articulate Sys.,* 53 F.Supp.2d at 75 ("Circumstances that have been deemed material include: the extent to which the inventor retained control over the invention and the dissemination of information concerning the invention during the period of its use, including whether a product embodying the invention was actually distributed to the public, whether the inventor secured a pledge of secrecy from the person to whom the invention was disclosed or before whom a product embodying the invention was used, the number of people to whom the invention or a product embodying the invention was disclosed, whether, if the inventor is relying on a claim of experimental use, records were kept of the progress of the experiment ... and whether the person to whom the invention was disclosed or for whose benefit a product embodying the invention was used was charged a fee.") (citations omitted). Section 102(b)'s public use bar to patent validity is "not limited to ... uses by the inventor or one under the inventor's control, but may result from activities of a third party which anticipate the invention, or render it obvious." *In re Epstein,* 32 F.3d 1559, 1564 (Fed.Cir.1994). "It is not necessary for a product to actually be accessible to the public to fall under Section 102(b)," but rather that the product has been used in a public fashion. *Gennodie v. Metro North Commuter Railroad Co.,* No. 91 Civ. 8445(DLC), 1995 WL 366442, at *4 (S.D.N.Y. June 20, 1995).

In considering whether a "public use" has occurred within the meaning of Section 102(b), courts have considered the "totality of the circumstances in conjunction with the policies underlying the public use bar." *Baxter Int'l, Inc. v. COBE Laboratories, Inc.,* 88 F.3d 1054, 1058 (Fed.Cir.1996) (citation omitted); *see Harrington Mfg. Co. v. Powell Mfg. Co.,* 815 F.2d 1478, 1480–81 (Fed.Cir.1986). Those policies include the following:

(1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.

*Tone Bros.,* 28 F.3d at 1198.

Though there are some important distinctions between Sections 102(a) and 102(b), for the purposes of the instant motions the only distinction of real moment is one of timing. Because the 516 patent application was filed in May of 1994, the critical date insofar as Section 102(b) is concerned is May of 1993. For the limited purposes of these motions, the parties have assumed that this application date is also the date of invention of Smarts' patented technology. *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1577 (Fed.Cir. 1996) (noting that filing date of patent would be default invention date for purposes of Section 102(a), absent evidence of earlier date of invention). Insofar as Section 102(a) is concerned, the critical date is therefore May of 1994.

■ The purposes underlying Section 102(g) are similar, in that it "encourages prompt disclosure of an invention by pe-

nalizing the unexcused delay or failure of a first inventor to share the 'benefit of the knowledge of [the] invention' with the public after the invention has been completed." *Checkpoint Sys. v. United States Int'l Trade Comm'n,* 54 F.3d 756, 761 (Fed.Cir.1995) (*quoting Paulik v. Rizkalla,* 760 F.2d 1270, 1280 (Fed.Cir.1985)). To qualify as prior art under Section 102(g), an invention must have been reduced to practice, and cannot have been abandoned, suppressed, or concealed. As with Section 102(a), the critical date by which the prior art must be invented is the date of invention of the challenged technology. *See Levi Strauss & Co.,* 1995 WL 710822, at *16.

▬ Abandonment, suppression, or concealment for the purposes of Section 102(g) "may be found 'if within a reasonable time after completion, no steps are taken to make the invention publicly known,'" *Levi Strauss & Co.,* 1995 WL 710822, at *18 (quoting *International Glass Co. v. United States,* 187 Ct.Cl. 376, 408 F.2d 395, 403 (1969)), and "[p]ossible steps include filing a patent application, describing the invention in a publicly disseminated document, and using the invention publicly." *Id.* As the Federal Circuit noted in *Checkpoint Systems,* a variety of factors may be considered in determining whether a prior invention has been relinquished under Section 102(g):

> When determining whether an inventor has abandoned, suppressed, or concealed an invention, a period of delay between completion of the invention and subsequent public disclosure may or may not be of legal consequence. The delay may be inconsequential if, for example, it is reasonable in length or excused by activities of the inventor. Furthermore, there is no particular length of delay that is per se unreasonable. Rather, a determination of abandonment, suppression, or concealment has "consistently been based on equitable principles and public policy as applied to the facts of each case." A court must determine

whether, under the facts before it, any delay was reasonable or excused as a matter of law.

> One way a prior inventor may avoid the disqualifying effect of § 102(g) is by promptly filing a patent application claiming the invention. In the usual context of an interference proceeding, each inventor involved in the proceeding will have filed a patent application, one of which may have matured into a patent. However, § 102(g) is applicable in other contexts as well, such as when it is asserted as a basis for invalidating a patent in defense to an infringement suit. In such a case, a first inventor may seek to avoid a determination of abandonment by showing that he or she marketed or sold a commercial embodiment of the invention or described the invention in a publicly disseminated document. If the prior inventor's activities following completion of the invention do not evidence abandonment, suppression, or concealment, § 102(g) will bar a later inventor from obtaining a patent.

54 F.3d at 761. For the purposes of Section 102(g), abandonment by the prior inventor is immaterial unless it occurred prior to the challenging party's own date of invention. *See Allen v. W.H. Brady Co.,* 508 F.2d 64, 67 (7th Cir.1974); *Oak Indus., Inc. v. Zenith Electronics Corp.,* 726 F.Supp. 1525, 1533 (N.D.Ill.1989).

▬ Avesta and Zager have indicated their belief that "overwhelming" evidence has been submitted indicating, *inter alia* (1) that Delphi was operational in the computer language "Smalltalk" by either 1990 or 1991; (2) that Delphi-related documents were not kept confidential at Morgan Stanley; (3) that Morgan Stanley employees outside of the corporate "Information Technology" (IT) Group responsible for Delphi were aware of Delphi, and created computer programs to interact with it; (4) that Delphi's existence was made known to individuals outside of Morgan Stanley, and that representatives of various companies unaffiliated with Morgan Stanley both

learned about and were given demonstrations of Delphi prior to 1993; and (5) that Delphi was not abandoned by Morgan Stanley prior to the critical dates.

Smarts has countered that much of Defendants' "evidence" is, in fact, inadmissible hearsay or otherwise deficient, and that the Defendants have failed to provide critical corroboration of testimony from interested witnesses. Smarts also presses that Delphi was "proprietary" software that was never actually used outside of Morgan Stanley's network.

In many respects, Smarts' position is well-taken. Despite Defendants' assertion that "[t]here is an enormous volume of admissible evidence that Delphi was accessible to the public," a great number of Defendants' submissions are laden with inadmissible hearsay, or fail to disclose critical information that could indicate their factual basis. For example, to support their assertion that the use of Delphi was freely disclosed to third parties, Defendants have submitted the declaration of Morgan Stanley employee Eric Kamen, who asserts as follows:

> I am aware that the use of the Delphi software was disclosed to several third parties prior to May 1993, specifically ParcPlace Systems, Inc., Hewlett–Packard Company, Network Equipment Technologies and Cabletron Systems, Inc.

Kamen Decl. ¶ 3. In similar fashion, former Morgan Stanley employee Gordon Ma has submitted a declaration that states the following:

> I know that the use of Delphi at Morgan Stanley was not kept secret. I know that people not employed by, nor affiliated with, Morgan Stanley saw Delphi's graphical user interface and were told how Morgan Stanley used Delphi to manage its information technology environment.

Ma Decl. ¶ 4.

However, these declarations do not disclose the factual basis for this "awareness" or knowledge. Kamen does not indicate that he himself disclosed information concerning Delphi or personally observed such disclosure, and it is impossible to tell from his statement whether such awareness is merely premised upon conversations with third parties—which would undoubtedly constitute hearsay. The same is the case for the quoted portions of Ma's declaration.

Yet another example is the declaration of Avesta employee and former Morgan Stanley employee Johnson Lu, who asserts the following:

> I know that Morgan Stanley employee Kevin Long, my predecessor as manager of the Delphi group, demonstrated Delphi to consultant John McConnell in 1994.

Lu Decl. ¶ 2. Defendants' best intentions notwithstanding, this statement fails to disclose the basis for Lu's knowledge and goes no distance towards establishing any prior art claims. Other submissions share similar infirmities, but in the interests of judicial economy these shall not be exhaustively detailed.

Other evidence submitted by the Defendants is noteworthy either for its lack of corroboration or for its questionable relevance. Most of the deposition testimony offered by the Defendants in opposition to Smarts' motion comes from interested Avesta employees or principals, and remains uncorroborated. As but one example among many, the Defendants offer the testimony of Avesta employee and former Morgan Stanley employee Robert Kostes for the proposition that Morgan Stanley demonstrated Delphi to a firm called ParcPlace, showing ParcPlace Delphi's "GUI," (graphical user interface), its "functionality," and operation. However, nowhere in the record does any specific, admissible corroboration of this testimony appear. No testimony from any ParcPlace employee appears in the voluminous deposition transcripts submitted by the parties, and no declaration from any ParcPlace representative has been submitted by Defendants.

Moreover, the mere fact that Delphi materials were accessible to Morgan Stanley employees other than the IT Group, or were stored on a common drive or server without restriction, would not suffice to satisfy Section 102(a) or (b). The availability of such information *within* Morgan Stanley, after all, indicates nothing about the availability of information concerning Delphi to those outside of Morgan Stanley, or to the "public" at large. Furthermore, to the extent that the Defendants seek to establish the lack of confidentiality accorded to Delphi materials by way of submission of documents post-dating the critical dates for purposes of Sections 102(a) and 102(b), it is worth noting that such documentation is not evidence about the handling of Delphi materials prior to 1993 or 1994.

However, while Defendants' evidence is by no means "overwhelming," the record, nevertheless, contains admissible and corroborated evidence that Delphi was in existence prior to 1992, and that at least one individual outside of Morgan Stanley received a description and a demonstration of Delphi software in either 1993 or 1994. While the corroboration does not extend nearly so far as the testimony of Avesta employees who were formerly associated with Morgan Stanley, it is sufficient to the task at hand—surviving a motion for summary judgment. The Defendants have offered enough evidence that a triable issue exists as to the applicability of Sections 102(a), 102(b), and 102(g).

More specifically, the Defendants have offered the corroborating declaration of Igor Klener, an employee of Cisco Systems, Inc. ("Cisco"), and from 1992 until 1998 the Cisco sales representative responsible for Cisco's Morgan Stanley account. Klener states:

> [I]n 1993 or 1994, I learned about the functionalities and capabilities of Morgan Stanley's network management program Delphi from Morgan Stanley representatives. My general understanding about Delphi, which I obtained from discussions with Morgan Stanley representatives and from viewing a Delphi user screen, is that Delphi monitored routers and servers, among other things, to manage the network.

Klener Decl. ¶ 3. Though other portions of Klener's declaration might constitute inadmissible hearsay,[1] and while the Defendants' failure to offer similar declarations or testimony from other third-party recipients of a Delphi demonstration is perhaps noteworthy, the Klener declaration nevertheless corroborates the testimony of former Morgan Stanley employees that Delphi was demonstrated to others, and that such demonstrations occurred perhaps as early as 1993.[2]

1. For example, Klener states that "[i]t is my understanding from my then-conversations with Morgan Stanley representatives that Delphi was fully operational before May 1993." This statement would not be admissible to establish the date by which Delphi was actually operational, as it depends on the accuracy of statements by unnamed Morgan Stanley representatives.

 However, despite Avesta's contention that the Klener declaration constitutes "rank hearsay" in its entirety, the rest of the Klener declaration would be admissible nonhearsay for the purposes for which it is being offered—to prove that Morgan Stanley disclosed and demonstrated Delphi to third-parties. As Smarts has indicated in its briefing materials, those portions of the Klener declaration are "not being offered to prove the truth of what the Morgan Stanley employees disclosed to Klener ... about Delphi," but rather are being "offered only to prove the *utterance.*"

2. The Defendants have also offered the declaration of Jonathan Rainer, a Manager and former Sales Representative at Network Equipment Technologies ("NET") for similar purposes. As Rainer states:

 > [I]n 1990 or 1991, I attempted to sell an NET network management platform to Morgan Stanley. At that time, Morgan Stanley representatives told me about ... Delphi and informed me that, because of the functionalities and capabilities of Delphi, Morgan Stanley had no need for NET's network management product.
 > It is my understanding from my then-conversations with Morgan Stanley representatives that Delphi was fully operational well before May 1993.

As a number of courts have held, the demonstration of an invention without obtaining assurances of confidentiality may well constitute "public use" under Section 102(b). *See Baxter Int'l*, 88 F.3d at 1058–59 (holding that operation of centrifuge in NIH laboratory, without "any discernable effort to maintain the centrifuge as confidential," constituted public use; noting that "those who observed the centrifuge in operation were under no duty to maintain it as confidential"); *Beachcombers v. WildeWood Creative Prods.*, 31 F.3d 1154, 1159–60 (Fed.Cir.1994) (holding that jury could have properly concluded that demonstration of invention at party constituted public use); *Harrington*, 815 F.2d at 1480–81 (finding that demonstration of mechanized tobacco harvester, without any promise of secrecy, constituted public use of invention under Section 102(b)); *In re Kaslow*, 707 F.2d 1366, 1372–74 (Fed.Cir. 1983) (holding that prior demonstration of computerized supermarket UPC code system was prior use under meaning of Section 102(b)); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 682–84 (7th Cir.1977) (holding that public demonstration of electronic organ at show for National Association of Music Manufacturers constituted public use under Section 102(b), despite fact that instrument was not then available for sale to the public). *But c.f. W.L. Gore & Assocs., Inc. v. Garlock*, 721 F.2d 1540, 1549 (Fed.Cir.1983) (holding that use of Teflon-stretching machine was not "public use" within meaning of Section 102(b); noting that employees were told to keep machine confidential, and "that Budd did not keep the machine hidden from employees legally bound to keep their knowledge confidential does not evidence a failure to maintain the secret"); *Xerox Corp. v. 3Com Corp.*, 26 F.Supp.2d 492, 494–97 (W.D.N.Y.1998) (holding that in-

ventor's disclosure of video tape "portraying his demonstration of [his] invention to the co-chair of an industry conference with an understanding and expectation of confidentiality ... with the limited purpose of review to determine whether it is accepted for presentation at a future scientific conference" did not constitute public "use" under Section 102(b).) No evidence of any confidentiality provision or agreement conditioning the disclosure of Delphi-related information appears in the record, and Smarts can point to no part of the record, as presently developed, indicating that such confidentiality would have been expected. Furthermore, Smarts has not identified any portion of the record that would indicate that any use of Delphi by Morgan Stanley was "experimental," such as would negate "public use." *See Baxter*, 88 F.3d at 1059 ("Experimental use negates public use; when proved, it may show that particular acts, even if apparently public in a colloquial sense, do not constitute a public use within the meaning of section 102"). The record contains no suggestion that any pre–1994 demonstrations by Morgan Stanley would have been orchestrated in order to obtain assistance in perfecting Delphi, or to obtain technical feedback for the benefit of Morgan Stanley's IT Group. Thus, a triable issue exists as to whether the nature of Delphi's use and availability was such that it qualifies as prior art under Section 102.

■■■■ Furthermore, a showing of either public use or public availability is not synonymous with a showing of public ubiquity. A single instance of public use can give rise to Section 102(b)'s bar to patentability, *see Martin v. Norman Indus.*, 725 F.2d 990, 993 (5th Cir.1984) (*citing In re Yarn Processing Patent Validity Litig.*,

---

Rainer Decl. ¶ 1993.

Insofar as the Rainer declaration relies upon information provided to Rainer by Morgan Stanley employees to draw conclusions about the actual operational date of Delphi, it constitutes inadmissible hearsay. Moreover, the Rainer declaration does not lend quite as much support to the Defendants' position as they would appear to believe, as it does not state that Rainer was ever actually provided with a demonstration of Delphi or was told or learned about the "functionalities and capabilities" of Delphi.

498 F.2d 271, 277 (5th Cir.1974)); *Levi Strauss & Co.,* 1995 WL 710822, at *18, and as explained earlier, Section 102(a) only requires that prior art be "accessible" or "available" to the public. Accessibility for the purposes of Section 102(a) "may be satisfied by work done in the open 'and in the ordinary course of the activities of the employer.'" *Levi Strauss & Co.,* 1995 WL 710822, at *17 (quoting *Rosaire v. Baroid Sales Division, National Lead Co.,* 218 F.2d 72, 75 (5th Cir.1955)). Actual use, knowledge, or awareness on the part of consumers, either general or specialized, is not required, and for the purposes of Section 102(b) "[i]t is not public knowledge of [an] invention which precludes patenting, but [rather] a public use ... of it." *Construction Specialties Inc. v. Arden Architectural Specialties, Inc.,* Civ. No. 4–90–536, 1991 WL 303471, at *3 (D.Minn. Aug. 6, 1991). Moreover, the term "public" in the context of a Section 102 inquiry "refers to those who have ordinary skill in the art, and not necessarily to the general public." *Aoki Tech. Lab., Inc. v. FMT Corp.,* 26 F.Supp.2d 319, 327 n. 18 (D.N.H.1998) (citing *UMC Electronics Co. v. United States,* 816 F.2d 647, 655 (Fed.Cir.1987)); *Levi Strauss & Co.,* 1995 WL 710822, at *17; *Oak Indus.,* 726 F.Supp. at 1537.

Smarts has suggested, unpersuasively, that Delphi should nevertheless be rejected as prior art under Section 102, as the Defendants have not offered any corroborated evidence that it was ever actually offered for sale or sold to anyone outside of Morgan Stanley, and because the Delphi system was both proprietary and difficult to modify to operate on third-party systems.

 While it is true that the only suggestions in the record that Morgan Stanley wished to sell its technology are tentative and appear in the testimony of interested Avesta witnesses, and the parties are apparently in agreement that the Delphi software was never actually sold during the relevant time period, the Court is aware of no authority holding that prior art must be offered for sale or actually sold to qualify under Section 102. Indeed, the express language of Section 102(b), which establishes a bar to patentability where prior art is either within public use *or* "on sale" in this country, indicates that these are alternate grounds for a finding of patent validity under Section 102(b). *See Electro–Nucleonics, Inc. v. Mossinghoff,* 593 F.Supp. 125, 127–28 (D.D.C.1984) (observing that, while "past cases often have lumped together the 'public use' and 'on sale' bars of Section 102(b), analysis 'becomes better focused when the two distinct bars are considered separately'"; holding that demonstration of centrifugal analyzer at trade show constituted public use under Section 102(b), despite fact that invention was neither sold nor "on sale" at convention). Moreover, that the Delphi software could not be used outside of Morgan Stanley's network without substantial modification is irrelevant. The question presented under Sections 102(a) and (b), after all, is whether Delphi was "accessible" or in "public use" as of the critical dates, not whether actual adoption of Delphi by third-parties would have been prudent, cost-effective, or otherwise worthwhile in terms of time and effort.

Additionally, Smarts has suggested that the record contains inadequate evidence concerning any such demonstrations, as Defendants have failed to offer specific evidence concerning the content of those demonstrations, and it is impossible to tell from the record whether those privy to such demonstrations or descriptions would have been made aware of the elements of Delphi that could constitute prior art. Smarts asserts that even if one grants that Morgan Stanley provided demonstrations of Delphi to third parties, "[t]here is no evidence that any recipient of any such demonstration could have understood anything about Delphi's event correlation method from such a limited viewing."

 There are two responses to this position. First, and most important, "there is no requirement that the activities

which constitute the 'on sale' or 'public use' bars be enabling, in the sense of disclosing the invention in such detail as to put the public in possession of the invention itself." 2 Gregory E. Upchurch, Intellectual Property Litigation Guide § 15.03[3][c] (1999); *see Lockwood v. American Airlines, Inc.,* 107 F.3d 1565, 1570 (Fed.Cir.1997); *In re Epstein,* 32 F.3d at 1568; *see also American Ceramicraft, Inc. v. Eisenbraun Reiss Inc.,* Civ. No. 92–2851, 1993 WL 498863, at *14 n. 14 (D.N.J. June 16, 1993) ("Demonstration of an invention at a trade show or convention is a public use, even if the invention is not offered for sale for several years thereafter. Furthermore, as quoted above, the invention need only be used 'in its natural and intended way.' That is, as long as the public use is natural, it need not disclose all the elements of every claim."). Thus, that the demonstrations or descriptions of Delphi did not disclose its underlying code or every last detail of its structure is of little importance given the nature of the Court's inquiry under Section 102(b).

Second, the premise underlying Smarts' present motion is that it is possible to foreclose any inquiry into the nature or structure of Delphi if the Defendants cannot offer adequate evidence of public use, accessibility, or prior invention without abandonment, suppression, or concealment. However, without any such analysis in the first instance, it is impossible at present to gauge whether any demonstrations or descriptions provided to those outside of Morgan Stanley contained information sufficient to make public or "available" those portions of the prior art that anticipated Smarts' patents. In other words, Smarts would have this Court foreclose Delphi as prior art based on the inadequacy of a demonstration when it is not at all clear—by Smarts' own design—what could or should have been demonstrated, or what aspect of the Delphi software was, in fact, anticipatory.

Triable issues thus exist with respect to the application of Sections 102(a), 102(b), and 102(g). It may of course be the case that, given both the nature of the prior art and the extent of Morgan Stanley's demonstration to third parties, Delphi may not ultimately qualify as prior art under those statutory provisions. However, such issues must be left for another day. *C.f. Articulate Sys.,* 53 F.Supp.2d at 63, 75–76 (holding that issue of whether invention's prior demonstration constituted clear and convincing evidence of patent invalidity was close question properly put to jury). At the present time, the Defendants have offered enough evidence to survive Smarts' motion for summary judgment and to create triable issues.

## II. *Smarts is Entitled to Summary Judgment Dismissing Defendants' Second, Fourth, and Fifth Counterclaims*

 Smarts has also moved to dismiss several of the Defendants' counterclaims. The counterclaims at issue allege unfair competition under both the Lanham Act and under the common law of New York, as well as violations of GBL §§ 349, 350.

According to the Defendants, the instant lawsuit was strategically initiated by Smarts to derail its efforts to market a competing software product, and both Smarts and counterclaim-defendant Shaula Yemini have publicized incorrect information about the lawsuit to Avesta's detriment.[3]

Smarts presses that it is entitled to summary judgment because, *inter alia* (1) there is no admissible evidence that any counterclaim defendant provided false information about Avesta; (2) there is no evidence that Smarts engaged in any improper conduct, or that any such conduct injured Avesta; and (3) there is a proper

---

**3.** Though the Defendants' Answer also lists Smarts employee Yechiam Yemini individually as a counterclaim defendant, they have acknowledged in their papers that they no longer wish to assert the counterclaims at issue against him personally.

basis for its patent infringement claims against Avesta.

As with the parties' papers in connection with the Delphi-related motion discussed above, the record is replete with much "evidence" of questionable worth and admissibility. The parties have jousted over every last item of evidence, and it is tempting to provide a comprehensive summary and evaluation of that evidence, but this temptation will be resisted.

The record contains some admissible evidence from which it could be concluded that the instant action has damaged Avesta, and that marketplace participants have perhaps shied away from purchasing Trinity or otherwise engaging in business dealings because of concerns about Smarts' potential entitlement to the technology incorporated into Avesta's Trinity product. Smarts' entreaties notwithstanding, the mere fact that Avesta has continued to engage in various business relationships with third parties aware of the lawsuit, that it has been otherwise successful in raising funds, or that it has subsequently engaged in "partnering" relationships with such third parties does not entitle it to summary judgment. The question presented, after all, is whether Avesta has suffered, or is likely to suffer, injury. The question is whether Avesta has lost actual or potential business, and not whether it has been put out of business completely. Perhaps the best example of the negative impact of this litigation is provided by Avesta's relationship with a company known as Tivoli, with which Avesta has actively sought an important "Original Equipment Manufacturer" ("OEM") agreement. According to the deposition testimony of Tivoli employee Rebecca Sanders, Tivoli's concerns about the Smarts lawsuit—and the riskiness of entering into an OEM agreement with Avesta when its software was subject to an infringement action[4]—was a factor in Avesta's failure to obtain at least one sought-after OEM arrangement. While Smarts presses that Avesta and Tivoli have nevertheless pursued various "partnering" deals, this is of little importance. The record indicates that partnering and OEM arrangements are distinct, and Smarts is not insulated from liability merely because the former was obtained in lieu of the latter.

While the Defendants have also noted, correctly, that much of the Defendants' evidence concerning the counterclaim-defendants' publicizing of Smarts' infringement claims is in the form of inadmissible hearsay, the record also contains ample admissible evidence that Smarts employees, including Yemini, informed third parties about the instant action.

This being said, Defendants have nevertheless failed to carry their burden of setting forth admissible evidence capable of sustaining the counterclaims at issue.

As the Federal Circuit recently held in *Zenith Elec. Corp. v. Exzec., Inc.*, 182 F.3d 1340 (Fed.Cir.1999), "before a patentee may be held liable under [the Lanham Act] for marketplace activity in support of its patent, the marketplace activity must have been undertaken in bad faith." *Id.* at 1353. Moreover, to the extent that claims premised upon state law would allow a plaintiff or counterclaim plaintiff to recover for identical marketplace activity without a showing of "bad faith," such claims would be preempted by Federal patent law. *See id.* at 1355. Because the "law recognizes a presumption that the assertion of a duly granted patent is made in good faith," *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1369 (Fed.Cir. 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1804, 143 L.Ed.2d 1008 (1999), the Defendants are charged with the task of coming forward with some affirmative evidence of bad faith in order to survive a motion for summary judgment. *C.f. Dow Chem. Co. v. Exxon Corp.*, 139 F.3d 1470,

---

4. According to Sanders, Tivoli was concerned about the potential "contamination" of its developers resulting from an OEM arrangement with Avesta.

1476 n. 6 (Fed.Cir.1998) ("We note that to survive a motion ... for summary judgment, more than a mere allegation of knowledge of the patent's unenforceability would be required."), *cert. denied,* 525 U.S. 1138, 119 S.Ct. 1026, 143 L.Ed.2d 37 (1999).

The Defendants press that this action has been undertaken in bad faith, and without any realistic or good-faith investigation concerning the bonafides of Smarts' claim of infringement. Defendants also contend that Smarts is well aware that its patents suffer from critical infirmities, and that Trinity would in no way infringe upon Smarts' software. According to the Defendants, the principals of Smarts were given the opportunity to evaluate the Trinity software for themselves, subject to a confidentiality agreement, but Smarts was intent on destroying a business rival by way of spurious infringement claims.

However, the record reveals no evidence whatsoever that the counterclaim defendants knew that the Smarts patents were unenforceable, or that the Trinity software was not infringing, at the time Smarts brought suit against Avesta and Zager. Moreover, nothing in the circumstances surrounding the initiation of the instant action gives rise to an inference that Smarts' patent claims were cynically designed to destroy a competitor, no matter their foundation. The notification of customers and potential customers of patent-related litigation, after all, is well within the range of actions a party with rights to enforce a patent may take to safeguard those rights, and Smarts' particular actions in informing third parties of its lawsuit do not give rise to an inference of bad faith.

Moreover, despite an unremarkable omission by one Smarts employee, who failed to inform an inquiring third-party that Avesta and Zager had indeed asserted counterclaims against Smarts, the record contains no evidence that Smarts provided incorrect information about the lawsuit itself to market participants.

Absent any evidence that could establish bad faith, the counterclaims put at issue by Smarts' motion must therefore be dismissed. The parties' other contentions regarding those counterclaims need not be addressed.

### Conclusion

For the reasons set forth above, Smarts' motions shall be granted in part and denied in part.

It is so ordered.